DEFENDERS OF WILDLIFE
Jason C. Rylander (DC Bar No. 474995)
1130 17th Street, NW
Washington, DC 20036
(202) 682-9400; Fax (202) 682-1331
jrylander@defenders.org
Appearance *pro hac vice*, pending admission

Rachel Zwillinger (CA Bar No. 268684)
980 9th Street, Suite 1730
Sacramento, CA 95814
415-686-2233; Fax (202) 682-1331
rzwillinger@defenders.org

*Attorneys for Plaintiffs*
*Defenders of Wildlife, Sierra Club, and*
*Santa Clara Valley Audubon Society*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA,
### SAN JOSE DIVISION

| | |
|---|---|
| DEFENDERS OF WILDLIFE, SIERRA CLUB, and SANTA CLARA VALLEY AUDUBON SOCIETY,<br><br>            Plaintiffs,<br><br> v.<br><br>U.S. FISH AND WILDLIFE SERVICE and U.S. ARMY CORPS OF ENGINEERS,<br><br>            Defendants. | ) CASE NO. 5:16-cv-1993 NC<br>)<br>) **NOTICE OF MOTION AND MOTION FOR**<br>) **TEMPORARY RESTRAINING ORDER**<br>) **AND/OR PRELIMINARY INJUNCTION;**<br>) **MEMORANDUM OF POINTS AND**<br>) **AUTHORITIES IN SUPPORT THEREOF**<br>)<br>) DATE**:**   TBD<br>) TIME:   TBD<br>) PLACE: TBD<br>)<br>)<br>)<br>) |

**NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION**

TO DEFENDANTS UNITED STATES FISH AND WILDLIFE SERVICE, UNITED STATES ARMY CORPS OF ENGINEERS AND THEIR ATTORNEYS OF RECORD: PLEASE TAKE NOTICE that at a time to be determined in the courtroom of Magistrate Judge Nathanael Cousins (Courtroom 7, 4th Floor), United States District Court, Northern District of California, located at 280 South 1st Street, San Jose, CA, Plaintiffs individually and on behalf of their members will move the Court pursuant to Rule 65 of the Federal Rules of Civil Procedure and Rule 65-1 of the Civil Local Rules for a temporary restraining order and/or preliminary injunction enjoining the operation of a Biological Opinion and Incidental Take Statement issued by Defendant U.S. Fish and Wildlife Service to Defendant U.S. Army Corps of Engineers under the Endangered Species Act for the Panoche Valley Solar Project in Panoche, CA. Plaintiffs further move the Court to enjoin a Clean Water Act dredge and fill permit that the Corps issued to Panoche Valley Solar, LLC, for the same project.

The next regularly scheduled date for a hearing on the preliminary injunction motion would be May 25, 2016, in the United States District Court, Northern District of California, located at 280 South 1st Street, San Jose, CA San Jose.

The Motion will be made on the grounds that Plaintiffs and their members will suffer irreparable injury unless the Biological Opinion and the Section 404 Permit described above are enjoined, and that the actions described above violate the Endangered Species Act, Clean Water Act, and the Administrative Procedure Act. Time is of the essence because the Defendants and project developers are already working to remove federally-listed endangered species from the project site pursuant to these authorizations. Loss of these species and the habitat will pose irreparable injury to Plaintiffs and their members.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

MEMORANDUM OF POINTS AND AUTHORITIES ................................................1

INTRODUCTION ..............................................................................................................1

STATUTORY BACKGROUND.........................................................................................2

    A.  Endangered Species Act Requirements ..............................................................2

    B.  Clean Water Act Requirements .............................................................................4

STATEMENT OF FACTS ..................................................................................................5

    I.     THE PANOCHE VALLEY IS A REFUGE FOR IMPERILED SPECIES .................5

    II.    THE PANOCHE VALLEY SOLAR PROJECT .........................................6

    III.   THE BIOLOGICAL OPINION AND SECTION 404 PERMIT.................................7

TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION STANDARD.........10

ARGUMENT .....................................................................................................................11

    I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS
         OF THEIR ESA CLAIMS .................................................................................11

       A.  The Service Failed to Ensure That Conservation Measures Intended to Avoid
           Jeopardy Were "Reasonably Certain to Occur"...................................................11

       B.  The Service Failed to Use the Best Available Scientific Data and Drew
           Conclusions That Are Arbitrary and Capricious ..................................................13

    II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS
         OF THEIR CWA SECTION 404 CLAIM.................................................................19

    III.   PLAINTIFFS' INTERESTS ARE LIKELY TO BE IRREPARABLY
         HARMED BY THE CONSTRUCTION OF THE PANOCHE VALLEY
         SOLAR PROJECT UNDER DEFENDANTS' AUTHORIZATIONS ......................20

    IV.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST
         SUPPORT AN INJUNCTION ...........................................................................23

    V.    NO BOND OR A NOMINAL BOND IS APPROPRIATE IN THIS CASE.............25

CONCLUSION..................................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Alaska Ctr. for the Env't v. West,
  31 F. Supp. 2d 711 (D. Alaska 1998) ...................................................................24

Alaska v. Lubchenko,
  723 F.3d 1043 (9th Cir. 2013) .............................................................................3

Alliance for the Wild Rockies v. Cottrell,
  632 F.3d 1127 (9th Cir. 2011) .......................................................................10, 23

Am. Motorcyclist Ass'n v. Watt,
  714 F.2d 962 (9th Cir. 1983) ...............................................................................24

Amoco Prod. Co. v. Vill. of Gambell, Alaska,
  480 U.S. 531 (1987) ...........................................................................................20

Ariz. Cattle Growers' Ass'n v. Salazar,
  606 F.3d 1160 (9th Cir. 2010) .............................................................................2

Bennett v. Spear,
  520 U.S. 154 (1997) ..........................................................................11, 13, 18

Connor v. Burford,
  848 F.2d 1441 (9th Cir. 1988) .........................................................................3, 13

Cottonwood Envtl L. Ctr. v. U.S. Forest Serv.,
  789 F.3d 1075 (9th Cir. 2015) .......................................................................10, 23

Ctr. for Biological Diversity v. Rumsfeld,
  198 F. Supp. 2d 1139 (D. Ariz. 2002) .................................................................14

Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.,
  698 F.3d 1101 (9th Cir. 2012) .......................................................................11, 12

Ctr. for Native Ecosystems v. U.S. Fish and Wildlife Serv.,
  795 F. Supp. 2d 1199 (D. Colo. 2011) ...............................................................3

Defenders of Wildlife v. Babbitt,
  958 F. Supp. 670 (D.D.C. 1997) .........................................................................4

Earth Island Inst. v. U.S. Forest Serv.,
  351 F.3d 1291 (9th Cir. 2003) .............................................................................24

iii

Grand Canyon Trust v. U.S. Bureau of Reclamation,
    No. CV-07-8164-PHX-DGC, 2010 WL 2643537 (D. Ariz. June 29, 2010),
    aff'd in part, appeal dismissed in part, 691 F.3d 1008 (9th Cir. 2012), as
    amended (Sept. 17, 2012) ............................................................................14

Greenpeace v. NMFS.,
    80 F. Supp. 2d 1137 (W.D. Wash. 2000)........................................................3, 10

High Sierra Hikers Ass'n v. Blackwell,
    390 F.3d 630 (9th Cir. 2004) ..............................................................................20

Hunt v. Wash. State Apple Adv. Comm'n,
    432 U.S. 333 (1977)............................................................................................11

Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.,
    99 F. Supp. 3d 1033 (N.D. Cal. 2015) ...............................................................13

Kootenai Tribe v. Veneman,
    313 F.3d 1094 (9th Cir. 2002) ............................................................................24

Landwatch v. Connaughton,
    905 F. Supp. 2d 1192 (D. Or. 2012) ..................................................................23

League of Wilderness Defenders/Blue Mountains Biodiversity Project v.
    Connaughton,
    752 F.3d 755 (9th Cir. 2014) ..............................................................................20

Lockheed Missile & Space Co. v. Hughes Aircraft,
    887 F. Supp. 1320 (N.D. Cal. 1995) ..................................................................10

Lujan v. Defenders of Wildlife,
    504 U.S. 555 (1992)............................................................................................11

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins.,
    463 U.S. 29 (1983)..............................................................................................18

N. Alaska Envtl. Ctr. v. Hodel,
    803 F.2d 466 (9th Cir. 1986) ..............................................................................24

Nat'l Parks Conservation Ass'n v. Babbitt,
    241 F.3d 722 (9th Cir. 2001) ..............................................................................24

Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,
    524 F.3d 917 (9th Cir. 2008) .................................................................1, 3, 13, 19

NRDC v. Evans,
    279 F. Supp. 2d (N.D. Cal. 2003) ......................................................................14

NRDC v. Houston,
    146 F.3d 1118 (9th Cir. 1998) ...........................................................................11

NRDC v. Kempthorne,
    506 F. Supp. 2d 322 (E.D. Cal. 2007)...................................................................3

NWF v. NMFS,
    254 F. Supp. 2d 1196 (D. Or. 2003) ..................................................................19

ONDA v. Tidwell,
    No. 03-381-HA, 2010 WL 5464269 (D. Or. Dec. 30, 2010).....................20, 21, 22

Pac. Coast Fed. of Fisherman's Ass'ns v. NMFS,
    265 F.3d 1028 (9th Cir. 2001) ...........................................................................17

Pac. Coast Fed. of Fisherman's v. BOR,
    426 F.3d 1082 (9th Cir. 2005) ...........................................................................17

Rock Creek All. v. U.S. Fish & Wildlife Serv.,
    663 F.3d 439 (9th Cir. 2011) .......................................................................12, 19

Sampson v. Murray,
    415 U.S. 61 (1974)............................................................................................24

San Luis v. Badgley,
    136 F. Supp. 2d 1136 (E.D. Cal. 2000)................................................................3

Save Our Sonoran v. Flowers,
    227 F. Supp. 2d 1111 (D. Ariz. 2002), aff'd 381 F.3d 905 (9th Cir. 2004)............24

Save Our Sonoran v. Flowers,
    408 F.3d 1113 (9th Cir. 2005) ...........................................................................24

Seattle Audubon Soc'y v. Evans,
    771 F. Supp. 1081 (W.D. Wash. 1991), aff'd 952 F.2d 297 (9th Cir. 1991)...........24

Sierra Club v. Eubanks,
    335 F. Supp. 2d 1070 (E.D. Cal. 2004)...............................................................24

Sierra Club v. Marsh,
    826 F.3d 1376 (9th Cir. 1987) ...........................................................................23

Sierra Club v. U.S. Army Corps of Eng'rs,
    645 F.3d 978 (8th Cir. 2011) .............................................................................23

Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,
    240 F.3d 832 (9th Cir. 2001) .............................................................................10

<u>Tenn. Valley Auth. (TVA) v. Hill</u>,
  437 U.S. 153 (1978)...............................................................................2, 10, 23

<u>California ex rel. Van de Kamp v. Tahoe Regional Planning Agency</u>,
  766 F.2d 1319 (9th Cir. 1985), <u>amended on other grounds</u>, 775 F.2d 998 (9th
  Cir. 1985) .......................................................................................................25

<u>W. Watersheds Project v. Kraayenbrink</u>,
  632 F.3d 472 (9th Cir. 2011) .........................................................................11

<u>Wash. Toxics Coal. v. EPA</u>,
  413 F.3d 1024 (9th Cir. 2005) .......................................................................23

<u>Wilderness Society v. Tyrrel</u>,
  701 F. Supp. 1473 (E.D. Cal. 1998)...............................................................24

<u>Winter v. Natural Res. Def. Council</u>,
  555 U.S. 7 (2008)......................................................................................10, 22

**Statutes**

5 U.S.C. § 706(2)(A), (D) ....................................................................................11

16 U.S.C. § 1536(a)(2)..........................................................................1, 2, 3, 13

16 U.S.C. § 1536(b)(3)(A) ......................................................................................3

16 U.S.C. § 1536(b)(4) ...........................................................................................4

16 U.S.C. § 1536(o)(2) ...........................................................................................4

16 U.S.C. §§ 1538(a)(1)(B), (G)............................................................................4

16 U.S.C. § 1540(g) ................................................................................................7

33 U.S.C. § 1251(a) ................................................................................................4

33 U.S.C. § 1344.....................................................................................................4

33 U.S.C. § 1344(b)(1) ...........................................................................................5

**Other Authorities**

33 C.F.R. §§ 320 <u>et seq</u>..........................................................................................4

33 C.F.R. §§ 320.4, 323.6.......................................................................................5

40 C.F.R. § 230 <u>et seq</u>............................................................................................5

40 C.F.R. § 230.1(c) ..................................................................................................5

40 C.F.R. §§ 230.10, 230.12 .....................................................................................5

40 C.F.R. § 230.10(b)(3) ...................................................................................1, 2, 19

40 C.F.R. §§ 230.10(b)(3), 230.12(a)(3)(ii) ...........................................................5, 6

40 C.F.R. § 230.30(b) ..............................................................................................19

40 C.F.R. § 230.30(c) ..............................................................................................19

50 C.F.R. § 17.3 .........................................................................................................4

50 C.F.R. § 402. ..................................................................................................12, 13

50 C.F.R. § 402.02 ................................................................................................2, 3

50 C.F.R. § 402.14(a) ................................................................................................3

50 C.F.R. §§ 402.14(g), (h) .......................................................................................3

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Plaintiffs request that this Court enjoin the Biological Opinion/Incidental Take Statement and the Clean Water Act Section 404 permit for the Panoche Valley Solar Project until Defendants fully comply with the Endangered Species Act (ESA) and the Clean Water Act (CWA). Plaintiffs seek immediate relief because federally endangered species are currently being removed from the site and irreparable harm will occur if construction of this project continues under these legally deficient authorizations.

These federal actions relate to a proposed 247-megawatt solar energy project on 2,154 acres in the ecologically sensitive Panoche Valley in San Benito County. Under Section 7 of the ESA, federal agencies such as the U.S. Army Corps of Engineers (Corps) must ensure that no project authorized, funded, or permitted will jeopardize the continued existence of any endangered species. 16 U.S.C. § 1536(a)(2). The CWA's Section 404(b)(1) guidelines governing discharges of dredged and fill materials into waters of the United States contain a similar requirement. 40 C.F.R. § 230.10(b)(3). In consultation with the Corps, the U.S. Fish and Wildlife Service (Service) prepared a Biological Opinion concluding that proposed solar facility will not jeopardize the survival and recovery of the critically imperiled blunt-nosed leopard lizard, the giant kangaroo rat, and the San Joaquin kit fox, among other ESA-listed species.

The Service's Biological Opinion and Incidental Take Statement violate the ESA because its conservation and mitigation requirements are not "reasonably certain to occur." Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv., 524 F.3d 917 n.17 (9th Cir. 2008) (NWF v. NMFS). These documents require that the Corps ensure implementation of conservation measures intended to protect against jeopardy for the entire project. That includes construction, operation, and maintenance for the 30-year life of the project as well as enforcing conservation measures on private mitigation lands. In the Record of Decision and Permit, however, the Corps explicitly disclaimed responsibility for endangered species protection except as pertains to its limited jurisdiction over "waters of the United States" and immediately adjacent uplands. Correspondence between the Service and Corps reveals longstanding disagreement over the

1

extent of the Corps' jurisdiction over this project. The Service's decision to issue a Biological Opinion requiring actions the Corps will not or cannot undertake was arbitrary and capricious.

The Service's Biological Opinion also violates the ESA because it failed to use the best available scientific data, arbitrarily ignored or discounted information by leading researchers on the affected species, and does not adequately explain its conclusion that the potential loss of hundreds of individual members of the three federally listed species and nearly 1,700 acres of essential habitat will not jeopardize their recovery.

The Corps therefore is also in violation of the Environmental Protection Agency's (EPA) Section 404(b)(1) guidelines, which prohibit the Corps from issuing a dredge and fill permit if the activity could "jeopardize[] the continued existence" of an endangered species. 40 C.F.R § 230.10(b)(3). Accordingly, the Section 404 permit must also be enjoined and set aside.[1]

## STATUTORY BACKGROUND

### A.  Endangered Species Act Requirements

At its passage, "the Endangered Species Act of 1973 represented the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." Tenn. Valley Auth. v. Hill, 437 U.S. 153, 180 (1978). The Supreme Court found it abundantly clear that "Congress intended endangered species to be afforded the highest of priorities," id., and that "[t]he plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost." Id. at 184. Accordingly, the Ninth Circuit holds the ESA reflects a policy of "institutionalized caution" intended to "give the benefit of the doubt to preserving endangered species." Ariz. Cattle Growers' Ass'n v. Salazar, 606 F.3d 1160, 1166–67 (9th Cir. 2010).

Section 7(a)(2) requires federal agencies to ensure, among other things, that any discretionary action they authorize, fund, or carry out "is not likely to jeopardize the continued existence of any endangered species." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.02 (defining

---

[1] For the purposes of this Motion only, Plaintiffs do not press their Fourth Claim for Relief against the Corps.

jeopardy). The jeopardy standard mandates that imperiled species not only survive, but "recover." <u>NWF v. NMFS</u>, 524 F.3d at 931–33. "Recovery" is the point at which a species is secure enough to be taken off the endangered species list. <u>Alaska v. Lubchenko</u>, 723 F.3d 1043, 1054 (9th Cir. 2013).

To comply with the jeopardy standard, the "action agency" must "consult" with and obtain the opinion of the Service before it takes any discretionary action that "may affect" a listed species. <u>See</u> 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a); <u>NWF v. NMFS</u>, 524 F.3d at 924. At the conclusion of the consultation process, the Service provides the action agency with a "biological opinion" as to whether jeopardy is likely to occur due to the action. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. §§ 402.14(g), (h). If so, the opinion sets forth the "reasonable and prudent alternatives" that would avoid this ESA violation. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. §§ 402.02 (defining "reasonable and prudent alternative"), 402.14(h)(3). An action agency violates its Section 7 duty if it relies on an inadequate, incomplete, or flawed biological opinion in carrying out an action.

The Service must use the best scientific and commercial data available in drafting a biological opinion. 16 U.S.C. § 1536(a)(2). Courts have interpreted the "best available data" standard broadly. The Service may not ignore available biological information, <u>Connor v. Burford</u>, 848 F.2d 1441, 1454 (9th Cir. 1988), and must address all such available data in its decision making, <u>San Luis v. Badgley</u>, 136 F. Supp. 2d 1136, 1147 (E.D. Cal. 2000). Credible anecdotal evidence may constitute the best available scientific data and the Service cannot ignore it, even if a full-scale study might be preferable. <u>Ctr. for Native Ecosystems v. U.S. Fish and Wildlife Serv.</u>, 795 F. Supp. 2d 1199, 1208 (D. Colo. 2011) (citing <u>Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.</u>, 475 F.3d 1136, 1147 (9th Cir. 2007)). Where data are available but have not yet been analyzed, the Service may not lawfully fail to analyze whether that data constitutes best available data and thereafter develop appropriate projections based on such data. <u>Greenpeace v. NMFS.</u>, 80 F. Supp. 2d 1137, 1149–50 (W.D. Wash. 2000). The Service may not rely on existing models and population abundance estimates based on past population data without acknowledging and analyzing more recently available population data. <u>NRDC v.</u>

NOTICE OF MOTION AND MOTION FOR TRO          AND/OR PRELIMINARY INJUNCTION; MPA
CASE NO. 5:16-cv-1993 NC

Kempthorne, 506 F. Supp. 2d 322, 362–66 (E.D. Cal. 2007).

Moreover, although a reviewing court will defer to the Service with respect to decisions made based on its technical expertise, such deference is not unlimited: "the presumption of agency expertise may be rebutted if its decisions, even though based on scientific expertise, are not reasoned." Defenders of Wildlife v. Babbitt, 958 F. Supp. 670, 679 (D.D.C. 1997). The Service is always obligated to articulate a rational connection between the facts it finds and the conclusions it reaches.

The ESA broadly prohibits the "take" of an endangered species of fish or wildlife. 16 U.S.C. §§ 1538(a)(1)(B), (G). This includes "significant habitat modification or degradation where it actually kills or injures wildlife significantly impairing essential behavioral patterns, including breeding, feeding or sheltering. 50 C.F.R. § 17.3. Federal agencies may only obtain authorization to take species through the Section 7 consultation process. 16 U.S.C. § 1536(o)(2). If an action will not jeopardize the species, the Service will issue an "incidental take statement" that must (1) specify the impacts on the species, (2) specify the reasonable and prudent measures that the Service considers necessary to minimize such impact, and (3) set forth the terms and conditions that must be complied with by the federal agency to implement these reasonable and prudent measures. 16 U.S.C. § 1536(b)(4). Failure to comply with the mandatory terms and conditions of an incidental take statement nullifies the protection from civil and criminal liability for take that occurs due to the action authorized by the agency.

**B.    Clean Water Act Requirements**

The CWA is designed to "restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA generally prohibits the discharge of pollutants, including dredged or fill material, into the waters of the United States unless authorized by a permit. See id. § 1311(a). Section 404 of the CWA authorizes the Corps to issue permits for such discharges into waters of the United States. 33 U.S.C. § 1344.

Corps regulations require that the agency weigh a broad range of public interest factors prior to issuing a permit. 33 C.F.R. §§ 320 et seq. These include "conservation" and "environmental concerns" as well as "fish and wildlife values." Id. § 320.4(a)(1). The Corps

must also abide by EPA regulations, the 404(b)(1) Guidelines, for Section 404 permits. 33 U.S.C. § 1344(b)(1); 40 C.F.R. § 230 et seq. "Fundamental to these Guidelines is the precept that dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern." 40 C.F.R. § 230.1(c).

The Corps must deny a permit application if issuing the permit would be contrary to the public interest or would not comport with the Section 404(b)(1) Guidelines. 33 C.F.R. §§ 320.4, 323.6; 40 C.F.R. §§ 230.10, 230.12. Among other requirements, EPA's guidelines prohibit the Corps from authorizing an application for dredge and fill activities if the activity "jeopardizes the continued existence" of an ESA-listed species. 40 C.F.R. §§ 230.10(b)(3), 230.12(a)(3)(ii).

## STATEMENT OF FACTS

## I.   THE PANOCHE VALLEY IS A REFUGE FOR IMPERILED SPECIES

California's Panoche Valley is a rare and special refuge for many threatened and endangered species. The Panoche Valley is the least developed of the three core areas necessary for the survival and recovery of the endangered San Joaquin kit fox, blunt-nosed leopard lizard, and the giant kangaroo rat. U.S. Fish & Wildlife Serv., Reinitiation of Formal Consultation for the Panoche Valley Solar Farm, San Benito County, California (File Number 2009-00443S), March 8, 2016 ("BiOp") at 39 (Exh. A). The Valley is a globally significant Audubon Important Bird Area and a haven for many other federally-listed or rare species, including the California condor, mountain plover, tiger salamander, vernal pool fairy shrimp, and various plants.

The giant kangaroo rat *(Dipodomys ingens)* is the largest of more than 20 species of kangaroo rats, small rodents that (as their name would suggest) move by hopping on their back legs. BiOp at 35. This furry, long-tailed seed-eater has lost more than 95 percent of its historic range and its populations are genetically isolated. Id. at 39. What remains of its highly fragmented, suboptimal habitat is threatened by oil and gas, residential, and large solar development. Id. The Panoche area is a critical dispersal corridor for maintaining the genetic health of the species. Id. at 38-39. The species has been listed as endangered since 1987.

The San Joaquin kit fox (*Vulpes macrotis mutica*) is the smallest canid species in North America, averaging just over 30 inches in length. The kit fox has suffered similar declines in population and habitat to the giant kangaroo rat, to which it is strongly ecologically linked. Id. at 41. When it was listed as endangered in 1967, the kit fox had already lost 80 percent of its habitat and substantial reductions have occurred since. Id. at 43. The kit fox's small population size and genetic isolation combined with ongoing threats of habitat conversion, fragmentation, and rodenticide use, have rendered the kit fox extremely vulnerable to extinction. Id. at 43-45.

The blunt-nosed leopard lizard (*Gambelia sila*) is a relatively large lizard (3.4 to 4.7 inches) with a short snout, powerful hind legs, and a regenerative tail. Id. at 46. Highlighting the ecological connection among species, the lizards often use rodent burrows and tunnels for shelter. Id. The lizard's habitat has also been severely reduced, degraded, and fragmented since the species was listed as endangered in 1967. Id. at 47–48. Of the less than 15 percent of lizard habitat that remains, the Ciervo-Panoche natural area is considered some of the best in the region. Id. at 48. The ever-decreasing blunt-nosed leopard lizard population is thought to be especially vulnerable to climate change impacts.

## II.    THE PANOCHE VALLEY SOLAR PROJECT

Panoche Valley Solar LLC intends to develop a massive solar energy project in this irreplaceable area of unique ecological value for ESA-listed and other rare species. The project site is located along Little Panoche Road in the heart of the Panoche Valley in San Benito County, some 30 miles south of Los Banos and 60 miles west of Fresno. The current proposal is for a 247-megawatt solar farm consisting of approximately 1,529 acres of photovoltaic panels installed on a 2,154-acre project site. Each panel will be roughly six by three feet in size. The project will also include electricity collection lines, operation and maintenance buildings, roads, fences, water tanks and treatment facilities, interconnection facilities, and compensatory mitigation lands. In total, the project and mitigation areas will affect more than 26,000 acres of sensitive habitat. Construction is expected to take 18 months. The project will operate for 30 years, after which it could be decommissioned or repurposed with new photovoltaic panels. As

designed, the project would impact 0.121 acres of jurisdictional wetlands, or 0.0056 percent of the project area. Various alternatives existed that would have avoided impacts to these lands.

III.     THE BIOLOGICAL OPINION AND SECTION 404 PERMIT

Panoche Valley Solar, LLC sought a Section 404 dredge and fill permit from the Corps. Because the complete project would also affect numerous endangered species, the Corps requested consultation with the Service pursuant to Section 7 of the ESA. The Service provided the Corps with a draft BiOp on August 21, 2015. (Exh. B). In a letter accompanying the draft, the Service explicitly raised questions regarding the extent of the Corps' jurisdiction over the project. See Letter from Stephen P. Henry, Field Supervisor, to Michael S. Jewell, Chief, Regulatory Divisions, Aug. 21, 2015. (Henry Letter, Exh. C). The letter asked the Corps "how you as the permitting agency would exert control over [the activities of other entities involved in the project] to ensure implementation of all measures and conditions contained in the biological opinion." Id. at 2. The Service warned that if the Corps did not accept responsibility for the operation, maintenance, and decommissioning of the project, as well as construction, the "take exception provided under section 7(o) would not extend to post construction activities." Id. The Service further warned that Panoche Valley Solar, LLC, could not enjoy the benefits of the consultation beyond that which the Corps itself would enforce, and that the applicant should apply for an Incidental Take Permit pursuant to section 10(a)(1)(B) of the ESA. Id.

On October 5, 2015, after receiving comments from the Corps, the Service issued its original biological opinion for the project. Despite the Service's earlier concerns that the Corps would not accept responsibility for ensuring compliance beyond the construction phase of the project, this opinion was expressly premised on the notion that the Corps would regulate the "construction, operations, and maintenance phases" (but not decommissioning) of the 30-year project. The transmittal letter warned "the Applicant can only rely on the safe harbor provided by the take exemption in section 7(o)(2) of the Act if the Terms and Conditions of the ITS have been included as binding, enforceable terms of the Corps' permit." Letter from Stephen P. Henry, Field Supervisor, to Michael S. Jewell, Chief, Regulatory Divs., Oct. 5, 2015 (Exh. D).

Pursuant to the ESA citizen suit notice requirement, 16 U.S.C. § 1540(g), Defenders of Wildlife sent the Corps and the Service a 60-day notice letter of intent to sue for violations of the

ESA related to the biological opinion on December 23, 2015. The letter sought reinitiation of consultation because the Service had failed to consider various expert opinions and other materials relevant to the analysis. Letter from Jason Rylander, Defenders of Wildlife to Sally Jewell, Secretary of the Interior and John McHugh, U.S. Army Corps of Eng'rs, Dec. 23, 2015 (Exh. E). Defenders also noticed Panoche Valley Solar, LLC, that it could not take listed species unless the terms and conditions of a valid BiOp were fully incorporated into a Section 404 permit. Letter from Jason Rylander to Eric Charniss, Panoche Valley Solar, LLC, Dec. 23, 2015 (Exh. E). Subsequently, the Corps reinitiated consultation and proposed some changes to the project. This resulted in the March 8, 2016 BiOp that is the subject of this suit. (Exh. A).

The revised final BiOp found that the project would not cause jeopardy to the blunt-nosed leopard lizard, the giant kangaroo rat, San Joaquin kit fox, and other listed species, provided that the Corps and the project developer agree to detailed terms and conditions specifying both on and off-site avoidance and mitigation measures for these species. Like the prior opinion, the new BiOp specifically requires that the Corps include these measures as binding, enforceable conditions in its Section 404 permit for the project and ensure the developer's compliance for the life of the project. BiOp at 106.

The Corps then issued a Record of Decision and a Section 404 permit for the Project. U.S. Army Corps of Eng'rs, Record of Decision, Action ID SPN-2009-00443, Mar. 31, 2016 (ROD) (Exh. F); Dep't of the Army Permit SPN-2009-00443, Mar. 25, 2016 (Exh. G). Contrary to the BiOp's clear terms, the ROD and Section 404 permit do not incorporate all the terms and conditions of the Incidental Take Statement. Instead, the Permit and ROD only require compliance with the "mandatory terms and conditions" that are "related to the Corps' jurisdiction." ROD at 22. The ROD then narrowly defines the Corps' jurisdiction over the action as "limited to construction activities within the 0.121 acres of water of the U.S. that would be filled, upland areas adjacent to the waters of the U.S. that would be filed, as well as upland access and staging areas." ROD at 22. Thus, in contravention of the BiOp, the Corps expressly rejected oversight responsibility for the entire project area for the life of the project.

As part of the project, the developer has promised to protect other existing habitat from some, but not necessarily all, potential incompatible uses. Notably, most of these lands are

subject to mineral claims; thus, "[t]he value of the conservation lands could be reduced if subsurface mineral rights are exercised." BiOp at 98. The BiOp also touts the preservation of an additional 1,000 acres of land suitable for the giant kangaroo rat, which the Service says may also provide benefits for San Joaquin kit foxes. Because this land has not yet been acquired, the Service does not know its ultimate location and has no means of assessing its conservation value to either of these species. Id. at 82. Regardless, these so-called mitigation lands represent a serious net loss of optimal habitat.

To reach its no jeopardy conclusion for the giant kangaroo rat, the Service states that "[a]lthough some occupied and suitable habitat would be removed and mortality of some individuals is expected, implementation of the proposed project would have minimal effect on, and would not impede recovery of the species due to preservation of important occupied habitat in the conservation lands and the capture and relocation measures incorporated into the project to minimize mortality to giant kangaroo rats." BiOp at 77. The Service assumes, however, that "all relocated individuals," which it estimates at 435, "may be directly lost or ecologically functionally lost by not reproducing." Id. at 69. This amounts to roughly 8 percent of the estimated regional giant kangaroo rat population.

To reach its no jeopardy conclusion for the San Joaquin kit fox, the Service concludes that "protection of lands to the north and south of the project site and the habitat corridor through the project footprint" will maintain "the function of the Ciervo-Panoche Natural Area" and thus the project will not impact its recovery. Id. at 86. In total, however, the project will result in the total loss of 1,688 acres of prime kit fox habitat. The species' Recovery Plan specifically calls for protecting 90 percent of "existing potential habitat" in the Ciervo-Panoche Natural Area. U.S. Fish & Wildlife Serv., Recovery Plan for Upland Species of the San Joaquin Valley, California, at Table 5 (1998), available at http://ecos.fws.gov/docs/recovery_plans/1998/980930a.pdf (Exh. H (excerpt)). The BiOp does not explain how many acres of kit fox habitat may be lost without affecting recovery.

To reach its no jeopardy conclusion for the blunt-nosed leopard lizard, the Service relies on "avoidance, minimization, and conservation measures" to "reduce effects to the species in the area and minimize adverse effect to recovery efforts." BiOp at 91. With respect to conservation,

1    the Service relies on the promised protection of conservation lands to "provide suitable habitat

2    for blunt-nosed leopard lizard occupation and movement through the area and allow for

3    continued function of the Ciervo-Panoche Natural Area as important habitat" for the species. Id.

4          In drawing these conclusions, the Service repeatedly rejects or discounts recent, credible

5    data prepared by leading species experts, including U.S. Geological Survey (USGS) scientists,

6    because the information was not subject to peer review. See, e.g., BiOp at 62, n.5, 89 n.10. At the

7    same time, the Service relies throughout on visual survey data provided by the applicant and the

8    Corps that was also not peer reviewed. See, e.g., BiOp at 56-57. The Service does not explain

9    this inconsistency, especially given that the ESA requires consideration of all credible data in its

10   decision making. Greenpeace v. NMFS. 80 F. Supp. 2d at 1149-50.

11   **TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION STANDARD**

12         The standard for issuing a temporary restraining order is identical to the standard for

13   issuing a preliminary injunction. See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., 240 F.3d

14   832, 839 n.7 (9th Cir. 2001); Lockheed Missile & Space Co. v. Hughes Aircraft, 887 F. Supp.

15   1320, 1323 (N.D. Cal. 1995). To obtain a preliminary injunction, Plaintiffs must show that they

16   are: "likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the

17   absence of preliminary relief, that the balance of equities tips in [their] favor, and that an

18   injunction is in the public interest." Winter v. Natural Res. Def. Council, 555 U.S. 7, 20 (2008).

19   The Ninth Circuit uses a "sliding scale" for preliminary relief, in which "the elements of the

20   preliminary injunction test are balanced, so that a stronger showing of one element may offset a

21   weaker showing of another." Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th

22   Cir. 2011) ("Cottrell"). In this Circuit, "'serious questions going to the merits' and a hardship

23   balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the

24   other two elements of the Winter test are also met." Cottrell, 632 F.3d at 1132.

25         In cases involving the ESA, however, the traditional preliminary injunction test does not

26   apply because Congress has determined that the balancing of equities and the public interest

27   must weigh in favor of preliminary injunctive relief. TVA v. Hill, 437 U.S. at 193–95 (1978);

28   Cottonwood Envtl L. Ctr. v. U.S. Forest Serv., 789 F.3d 1075, 1091 (9th Cir. 2015) ("the equities

and public interest factors always tip in favor of the protected species"). A plaintiff must still show irreparable injury to justify injunctive relief, but "in light of the stated purposes of the ESA in conserving endangered and threatened species and the ecosystems that support them, establishing irreparable injury should not be an onerous task for plaintiffs." Id. (citing 16 U.S.C. § 1531). As set forth below Plaintiffs meet the requirements for a preliminary injunction.[2]

Plaintiffs' claims arise under the Administrative Procedure Act. Bennett v. Spear, 520 U.S. 154, 156 (1997). Courts apply the "arbitrary or capricious," "not in accordance with law," and "without observance of procedure required by law" standards of the APA, 5 U.S.C. § 706(2)(A), (D), to both types of claims. See, e.g., W. Watersheds Project v. Kraayenbrink, 632 F.3d 472, 496 (9th Cir. 2011); NRDC v. Houston, 146 F.3d 1118, 1125 (9th Cir. 1998).

## ARGUMENT

## I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR ESA CLAIMS AGAINST THE SERVICE

A Biological Opinion is arbitrary and capricious if it fails to "consider[ ] the relevant factors and articulate[ ] a rational connection between the facts found and the choice made." Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt., 698 F.3d 1101, 1121 (9th Cir. 2012). For the following reasons, the Panoche BiOp should be enjoined and set aside.

### A.   The Service Failed to Ensure That Conservation Measures Intended to Avoid Jeopardy Were "Reasonably Certain to Occur"

Serious questions exist as to whether the Corps intends to utilize its authorities to fully implement and enforce the BiOp's terms and conditions. The Service's revised BiOp is premised on the Corps regulating all phases of the project except decommissioning. BiOp at 106. According to the Service, "The Corps has a continuing duty to monitor and regulate the activity covered by these Incidental Take Statements and the Corps and the Applicant have a continuing

---

[2] Plaintiffs concurrently submit the declarations of Pamela Flick (Exh. I); Bob Hirt (Exh. J); Tanya Diamond (Exh. K); Ahíga Roger Snyder (Exh. L) to demonstrate constitutional Article III standing. See Hunt v. Wash. State Apple Adv. Comm'n, 432 U.S. 333, 343 (1977); Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992).

duty to comply with the Reasonable and Prudent Measures and implementing Terms and Conditions set forth below." <u>Id.</u> (emphasis added). This includes monitoring and twice-yearly reporting for the life of the project. <u>Id.</u> at 120. Should the amount of incidental take be exceeded, new information arise, or new species be listed in the project area, the Corps must reinitiate consultation to the extent it has retained "control over the action." <u>Id.</u> at 122 (emphasis added).

The Corps, for its part, has long said it would <u>not</u> accept responsibility for any phases of the project beyond construction and "would not comply with the duty to reinitiate consultation under 50 C.F.R. § 402.16 if any consultation reinitiation trigger is met, including if the anticipated level of take is exceeded, during these post-construction activities." Henry Letter (<u>Exh</u>. <u>C</u>), at 2–3. Consistent with its position, the Corps conditioned the Section 404 permit on compliance with BiOp terms and conditions "related to the Corps' jurisdiction" which is "limited to construction activities within the 0.121 acres of water of the U.S. that would be filled, upland areas adjacent to the waters of the U.S. that would be filled, as well as upland access and staging areas." ROD at 22; Permit at 6–7. Thus, the Corps has made only a narrow subset of the BiOp's avoidance, mitigation, and conservation measures binding and enforceable through the Section 404 permit.

The Biological Opinion makes clear that the "no jeopardy" determination for blunt-nosed leopard lizard, San Joaquin kit fox, and giant kangaroo rat depends on the Corps incorporating <u>all</u> of the mitigation measures specified in the BiOp as binding conditions of any 404 permit. <u>See</u>, <u>e.g.</u>, BiOp at 103 (concluding effect on reproduction for blunt-nosed leopard lizard will be small because "avoidance and minimization measures will minimize such losses" and a "small" effect will not appreciably reduce reproduction range wide); <u>id.</u> (relying on "avoidance, minimization, and conservation measures" to conclude that numbers of blunt-nosed leopard lizard "will minimize" losses, such that numbers will be only "slightly reduced"); <u>id.</u> at 103–104 (relying on "avoidance, minimization, and conservation measures" for blunt-nosed leopard lizard to minimize adverse effects on recovery); <u>id.</u> at 83–84, 101 (relying on  avoidance and minimization measures to conclude that impacts to numbers and reproduction of San Joaquin kit fox will be minimal); <u>id.</u> at 84, 102 (relying on  "avoidance, minimization, and conservation

measures" for San Joaquin kit fox to "minimize" and adverse effects on recovery); see also id. at 106, 116–117 (for incidental take coverage to apply, "[t]he Corps must include all measures, plans, conditions, and reporting requirements in the biological assessment and this biological opinion as binding terms and conditions of any and all permits it issues for the project and must monitor and enforce their implementation."). If the Corps will not accept these responsibilities, then this project lacks meaningful mitigation and there is no assurance against jeopardy.

The Service's failure to resolve these critical jurisdictional questions prior to issuing the BiOp and authorizing incidental take of three endangered species raises serious questions as to whether the terms and conditions will be enforced. "Mitigation measures supporting a biological opinion's no-jeopardy conclusion must be 'reasonably specific, certain to occur, and capable of implementation; they must be subject to deadlines or otherwise-enforceable obligations; and most important, they must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards.'" Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin., 99 F. Supp. 3d 1033, 1055 (N.D. Cal. 2015) (quoting Ctr. for Biological Diversity v. Rumsfeld, 198 F. Supp. 2d 1139, 1152 (D. Ariz. 2002)); NWF v. NMFS, 524 F.3d at 935–36 n.17 (finding agency's "sincere general commitment to future improvements" inadequate to support no-jeopardy conclusion). The Service cannot rationally expect that conservation measures and conditions in a no jeopardy biological opinion will be "certain to occur" if the Corps refuses at the outset to implement them.

### B.     The Service Failed to Use the Best Available Scientific Data and Drew Conclusions That Are Arbitrary and Capricious

Section 7 consultations must be conducted based on the best available scientific data. 16 U.S.C. § 1536(a)(2); NWF v. NMFS, 524 F.3d at 924 (same); Bennett v. Spear, 520 U.S. at 176 (1997) ("The obvious purpose of the requirement that each agency 'use the best scientific and commercial data available' is to ensure that the ESA not be implemented haphazardly, on the basis of speculation or surmise."). The Service's may not ignore available biological information. Connor v. Burford, 848 F.2d at 1454.

1    In the present case, the Service failed to base its no jeopardy conclusions for the giant

2    kangaroo rat, the San Joaquin kit fox, and the blunt-nosed leopard lizard on the best available

3    scientific data. The Service repeatedly rejected or discounted recent, credible data prepared by

4    species experts, including USGS scientists, because the information had not yet been peer

5    reviewed. BiOp at 62 n.5; 89 n.10. The ESA does not permit the Service to exclude such data.

6    NRDC v. Evans, 279 F. Supp. 2d at 1179–80 (N.D. Cal. 2003) (consultation cannot exclude the

7    "most relevant scientific data available from reputable scientists on the ground that it was not

8    perfect"). Yet the Service arbitrarily relies throughout the BiOp on survey data provided by the

9    applicant and the Corps that was also not peer reviewed. See, e.g., BiOp at 56-57.

10    In particular, the Service rejected a genetic study of blunt-nosed leopard lizards prepared

11    by the USGS for the Bureau of Land Management on the grounds that "it has not been subject to

12    peer review and is not considered as best scientific information available." BiOp at 89 n.10.

13    Under the ESA and Service's own guidelines, however, lack of peer review does not in any way

14    disqualify data from being the best information available. Ctr. for Biological Diversity v.

15    Rumsfeld, 198 F. Supp. 2d at , 1156 ("Looking at the best scientific and commercial [data]

16    available is a standard that requires far less than conclusive proof. This standard recognizes that

17    better scientific evidence will most likely always be available in the future."). Absence of peer

18    review "does not per se show that the science used is not the best available." Grand Canyon

19    Trust v. U.S. Bureau of Reclamation, No. CV-07-8164-PHX-DGC, 2010 WL 2643537, at *17

20    (D. Ariz. June 29, 2010), aff'd in part, appeal dismissed in part, 691 F.3d 1008 (9th Cir. 2012),

21    as amended (Sept. 17, 2012).

22    The Service avers that it can ignore the USGS genetic study because it relied instead on a

23    peer reviewed study by Grimes (2014). But Grimes analyzed the tissue of *a single blunt-nosed*

24    *leopard lizard* from the Panoche Valley whereas the more recent and detailed USGS survey

25    "includes over two orders of magnitude more information (more than 100 times the data content)

26    on nuclear genes (Single Nucleotide Polymorphisms) and mitochondrial genes, compared to the

27    use of mitochondrial genes published in the preliminary genetic assessment of Grimes et al.

28    (2014)." Declaration of Dr. Barry Sinervo ¶ 22 (Exh. M). The Service's reliance on the

14

1    extremely limited data in Grimes (2014) to draw inferences about the genetic uniqueness of

2    Panoche Valley floor populations is arbitrary and capricious where the far more robust data in

3    the USGS study shows that the valley floor populations are distinct.

4            For the blunt-nosed leopard lizard, the Service also arbitrarily rejected models by Dr.

5    Barry Sinervo. BiOp at 62 n.5. To the extent the Service did review Dr. Sinervo's model, the

6    agency failed to grasp the implications for determining site occupancy. The Service used survey

7    data to conclude that losses of blunt-nosed leopard lizards within the Project's construction

8    footprint would not be large enough to impact the species on a range wide scale. BiOp at 90-91.

9    By failing to incorporate Dr. Sinervo's model, however, the Service may have significantly

10   underestimated the proportion of blunt-nosed leopard lizards present in grassland areas relative

11   to washes during dry years. Sinervo's model *corrected* for biases in survey techniques that would

12   otherwise underestimate the population of lizards in the grasslands areas. See Sinervo Decl. ¶¶

13   13-14, 21 (explaining model that was presented to the Service). In fact, Dr. Sinervo warned the

14   Corps that the number of lizards lost would be large enough to jeopardize the species. See Letter

15   from Dr. Barry Sinervo to Lisa Gibson, Oct. 26, 2015 (Exh. N). See also Sinervo Decl. ¶ 14

16   (calculating "the take of lizards based on the survey data and the habitat occupancy model would

17   be 661 adults and juveniles."). The Service's conclusion that no jeopardy would result where "all

18   blunt-nosed leopard lizards within the 2,156 acres of permanent and temporary disturbance

19   would be taken by the proposed action," BiOp at 110, was based on the erroneous presumption

20   that densities of lizards in grassland areas were lower than they actually are due to the arbitrary

21   and capricious failure to meaningfully address the best available scientific data. Further, the

22   BiOp fails to address the best available science indicating that the effects of fragmentation (the

23   division of formerly large contiguous habitat areas into smaller areas) may result in extirpation of

24   blunt-nosed leopard lizard populations outside the Project's construction footprint. See Sinervo

25   Decl. ¶¶ 23-25 (referring to published research by Bailey and Germano (2015)).

26

27

28

For the giant kangaroo rat, the Service ignored scientific data showing a recent dramatic decline in the regional population.[3] Dr. William Bean informed the Corps of data he collected showing that giant kangaroo rat densities (the number of individuals per acre) had dropped drastically between 2011 and 2014 across the entire Ciervo-Panoche Natural Area, indicating that the population potentially was approaching an "extinction vortex"—a situation where the small population size itself causes or accelerates further population loss, leading to extirpation. Letter from Dr. William Bean to Lisa Gibson, Oct. 23, 2015 (Exh. N). See also Declaration of Dr. William Bean (Exh. ¶¶ 26-27). Instead of evaluating this alarming evidence to determine whether further losses of some additional percentage of the population (due to the Project) would send the regional population into an "extinction vortex," the Service cursorily dismissed the data on the ground that "Bean 2013 and 2014… use regional trapping results and therefore are not directly relevant to the analysis of effects of the Project in Panoche Valley." BiOp at 56 n.2. See also Bean Decl. ¶ 28.

Rather, the Service relied on calculations showing that the estimated number of giant kangaroo rats lost as a result of the Project activities (435 individuals), is purportedly small relative to the total number of giant kangaroo rats offsite (5,166). See BiOp at 56 n.2 (relying on result derived from visual survey data to reject consideration of data and model from Bean); 57-59 (explaining estimates derived from visual survey and active precinct count data). But in so doing, the Service failed to address other scientific information that was placed before it. As Dr. Bean explained in the October 23, 2015 letter, these respective numbers rely on a methodology (active precinct counts and visual survey data) that cannot provide an accurate estimate of the actual populations at a given time, but rather can only be used to calculate *long-term* averages for the population expected at a given location. Bean Letter at 1-2. See also Bean Decl. ¶¶ 18-24. Since there is "no relationship between active burrow precinct counts and single year population sizes for giant kangaroo rats," the Service's use of this method for a short-term population

---

[3] The regional population is referred to as a "metapopulation" and is composed of a number of local populations. See Bean Decl. ¶ 10 (explaining terminology).

1    estimate "produces nonsensical results." Bean Letter at 4. Because visual surveys cannot

2    accurately predict current populations in the project footprint or offsite areas, it thus cannot

3    provide even a coarse estimate of the current proportion of the individuals lost due to the Project

4    relative to the number persisting offsite. See id. The Service's only response to this concern is to

5    misrepresent Dr. Bean's letter as validating their approach, BiOp at 70 n.8; see Bean Decl. ¶ 24,

6    and to purport to "acknowledge Dr. Bean's concerns" but conclude (without explanation) that

7    calculations based on visual survey results and a 20-year old study (Williams 1995) also derived

8    from the same faulty active precinct count method, are "the best" information. BiOp at 57 n.3;

9    see Bean Decl. ¶ 25. Consequently, the Service may have grossly overestimated the number of

10   giant kangaroo rats on the conservation lands, and underestimated the impact of losing the

11   individuals presently living within the construction footprint.

12          Dr. Bean's data also shows that current (drought) conditions likely make the immediate

13   impact of losing the individuals from the Project site far greater than would be anticipated based

14   on long-term averages. By ignoring this data, the Service has made an error similar to that in

15   numerous other cases where BiOps failed to address short-term circumstances that could result in

16   jeopardy by relying on long term benefits of mitigation. See, e.g., Pac. Coast Fed. of Fisherman's

17   v. BOR, 426 F.3d 1082, 1094 (9th Cir. 2005) (rejecting agency's no-jeopardy conclusion based

18   on RPA that failed to analyze short-term impacts on species with three-year life cycle); Pac.

19   Coast Fed. of Fisherman's Ass'ns v. NMFS, 265 F.3d 1028, 1037–38 (9th Cir. 2001) ("Given the

20   importance of the near-term period on listed species survival it is difficult to justify NMFS's

21   choice not to assess degradation over a time frame that takes into account the actual behavior of

22   the species in danger.").

23          Taking the Service's calculations at face value, the Service still never explains how the

24   potential loss of all 435 giant kangaroo rats and 1,688 acres of prime habitat on the site can be

25   offset by merely maintaining current conditions on habitat elsewhere in the region. Moreover,

26   the Service's conclusion that an additional 1,000 acres of land, which the applicant recently

27   proposed to obtain for the giant kangaroo rat, will help mitigate these losses is unsupportable

28   when the Service does not know what lands will be protected, when they will be protected, and

17

what their conservation value may be. BiOp at 59. As Dr. Bean put it, "[A]ny conclusion that the protection of other lands will offset the loss of the project site habitat is akin to losing one wheel of a car but celebrating the remaining three." Bean Letter at 5. Given the importance of the habitat on the project site, which is at the center of the species' metapopulation and serves as a "stepping stone" between colonies, the Service has no basis to conclude that these losses will not impact the recovery of the species.

For the San Joaquin kit fox, the Service claims the "function of the Ciervo-Panoche Natural Area will be maintained and recovery of the species will not be impeded by the proposed project." BiOp. at 86. Although the Service presumes all 435 translocated giant kangaroo rats will fail to persist, the Service never considers what impact the failed relocation of the entire giant kangaroo rat population from the site will have on the kit fox, which feeds on the rats and is ecologically linked to the species. The Service also does not adequately explain how loss of 1,688 acres of "optimal" kit fox habitat is effectively mitigated by preserving existing habitat elsewhere. This is particularly significant for the kit fox because the species' recovery plan explicitly calls for preservation of 90 percent of "existing potential habitat" in the Ciervo-Panoche Natural Area. Recovery Plan Table 5 (Exh. H). The Service never analyzes what impact this loss of habitat will have on that goal, including whether that threshold may be crossed by this and other projects. Similarly, the Service's assumption that the 1,000 acres of additional, yet to be identified, giant kangaroo rat conservation lands will also benefit the kit fox is wishful thinking, BiOp at 82, particularly if, as the Service suspects, all translocated rats perish.

As these examples demonstrate, the Service repeatedly engages in "speculation and surmise" to conclude that the Panoche Valley project will not jeopardize the survival and recovery of these species. Bennett v. Spear, 520 U.S. at 176. Agency action is arbitrary and capricious where the agency has failed to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' " Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins., 463 U.S. 29, 43 (1983). Because the Service has failed to use the best available scientific data or to articulate a reasoned basis for its conclusions, the Biological Opinion must be enjoined and set aside.

1

2

## II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CWA CLAIM AGAINST THE CORPS

3

4      EPA's 404(b)(1) Guidelines prohibit the Corps from authorizing an application for

5   dredge and fill activities if, inter alia, the activity "jeopardizes the continued existence" of an

6   ESA-listed species. 40 C.F.R. § 230.10(b)(3). The 404(b)(1) Guidelines further state that the

7   impacts on ESA-listed species the Corps must consider both direct and indirect impacts from the

8   dredge or fill activities. 40 C.F.R. § 230.30(b) ("The major potential impacts on threatened or

9   endangered species from the discharge of dredged or fill material include . . . (3) Facilitating

10  incompatible activities."). Under the 404(b)(1) Guidelines, the Corps' determination of whether

11  an activity "jeopardizes the continued existence" of an ESA endangered species is determined by

12  the outcome of the formal consultation process under the ESA. 40 C.F.R. § 230.30(c).

13      The Corps' reliance on the final Biological Opinion to assert that issuance of the

14  discharge will not jeopardize any ESA-listed species is arbitrary and capricious. As discussed

15  above, the BiOp's "no jeopardy" determination for blunt-nosed leopard lizard, San Joaquin kit

16  fox, and other species depends on the Corps incorporating all of the mitigation measures

17  specified in the Biological Opinion as binding conditions of any 404 permit. The Corps,

18  however, has expressly limited its jurisdiction over the project to the tiny fraction of the project

19  area related to "waters of the United States" and then only during the construction phase of the

20  project. The BiOp's conclusions are also suspect because it is not based on the best scientific

21  data available and is otherwise arbitrary and capricious.

22      This raises serious questions as to the validity of the BiOp and the enforceability of its

23  terms and conditions. Rock Creek All. v. U.S. Fish & Wildlife Serv., 663 F.3d 439, 444 (9th Cir.

24  2011) (upholding reliance on a mitigation plan where the action agency has "specific and binding

25  plans," "solid guarantees," and a "clear, definite commitment of resources."); NWF v. NMFS,

26  524 F.3d at 935-36 (mitigation measures in a no jeopardy opinion must be "reasonably certain to

27  occur"); NWF v. NMFS, 254 F. Supp. 2d 1196, 1205, 1213–15 (D. Or. 2003) (noting that "if

28  proposed range-wide, off-site mitigation actions are not, in reality, part of the action area, they

    should not have been included within the "cumulative effects" analysis [in the BiOp]"). In the

    absence of the full administrative record that could shed light on this serious disconnect between

1    the agencies, two conclusions are possible: either the Corps, in communications with the Service,

2    misrepresented its intent to exert its authority over the entire project for the duration of the

3    project, or the Service issued a BiOp with terms and conditions that it knew or should have

4    known the Corps had no intention of upholding.

5        Either way, the BiOp is arbitrary and capricious and the Corps cannot rely upon it to

6    satisfy its own substantive and procedural obligations to ensure against jeopardy to listed species

7    pursuant to EPA's Section 404(b)(1) Guidelines. Under the circumstances, the Corps' Section

8    404 permit and the Record of Decision should be enjoined pending resolution of these issues.

9    **III.    PLAINTIFFS' INTERESTS ARE LIKELY TO BE IRREPARABLY HARMED BY
         THE CONSTRUCTION OF THE PANOCHE VALLEY SOLAR PROJECT
10        UNDER DEFENDANTS' AUTHORIZATIONS**

11        The Project will irreparably harm Plaintiff's interests in the recovery of multiple

12   endangered species and in the preservation of the natural ecosystem of the Panoche Valley.

13   Environmental injury is often irreparable and favors the issuance of an injunction.

14   "Environmental injury, by its nature, can seldom be adequately remedied by money damages and

15   is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently

16   likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect

17   the environment." Amoco Prod. Co. v. Vill. of Gambell, Alaska, 480 U.S. 531, 545 (1987);

18   League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton, 752 F.3d

19   755, 764 (9th Cir. 2014) (quoting Amoco). In addition, "habitat modification that is reasonably

20   certain to injure an endangered species establishes irreparable injury." ONDA v. Tidwell, No.

21   03-381-HA, 2010 WL 5464269, *3 (D. Or. Dec. 30, 2010) (citing Defenders of Wildlife v.

22   Bernal, 204 F.3d 920, 925 (9th Cir. 2000)). See also High Sierra Hikers Ass'n v. Blackwell, 390

23   F.3d 630, 642 (9th Cir. 2004) (finding that irreparable injury was "likely" due to "injury to

24   environmentally sensitive areas and a reduction in the population of sensitive species").

25        Here, it is undisputed that the Project will likely kill and injure individual members of at

26   least three endangered species. See BiOp at 69 ("Because we cannot determine the rate of

27   success or be assured of continued persistence and reproduction within the relocated populations

28   . . . we assume that all relocated [giant kangaroo rat] individuals (435) may be directly lost or

20

ecologically functionally lost by not reproducing."); id. at 108 (ITS) ("we anticipate that up to 435 individual giant kangaroo rats would be taken by capture, and that up to 9 of those captured may die as a direct result of their handling during capture and relocation. Also, as described above, we assume in our analysis that all 435 relocated individuals may be directly lost or ecologically functionally lost by not reproducing."); id. ("We estimate that up to 16 San Joaquin kit foxes currently inhabit the solar generation facility area and all would be subject to take in the form of harm as a result of construction of the proposed solar arrays and associated infrastructure."); id. at 109 ("we can expect that up to 3 of the 22 San Joaquin kit foxes in the project area may be subject to take caused by vehicle strike."); id. at 110 ("while we are reasonably certain that some take will occur, we are unable to anticipate the actual number of blunt-nosed leopard lizards that would be taken … Therefore, we anticipate that all blunt-nosed leopard lizards within the 2,154 acres of permanent and temporary disturbance would be taken by the proposed action."); see also Sinervo Decl. ¶ 14 (estimating 661 blunt-nosed leopard lizards will be taken in the construction footprint of the Project).

Further, it is undisputed that the Project will result in a permanent net loss of habitat for species that are endangered precisely because of past habitat loss, and who have been confined to a fraction of their historical range. BiOp at 36, 43, 47 (describing range reduction); id. at 67 ("we conclude that the 2,154 acres of giant kangaroo habitat affected permanently or temporarily by construction activities would likely not be re-occupied by the species."); id. at 73 (regardless of conservation lands "[t]he project would result in a net loss of suitable and occupied habitat for the species [giant kangaroo rat]."); id. at 82 ("Despite the conservation of existing habitat, the project would still result in a net loss of suitable and occupied habitat for the San Joaquin kit fox"); id. at 88 ("Despite the conservation of existing habitat, the project would still result in a net loss of 1,688 acres of suitable and occupied habitat for the blunt-nosed leopard lizard.").

Moreover, the loss of these individuals, and the destruction of their vitally important habitat, will impair the capacity of these endangered species to ever recover to the point of being no longer in danger of extinction. See Sinervo Decl. ¶¶ 11 ("a considerable take of blunt-nosed leopard lizard ("BNLL") is likely to occur… this take will preclude the survival and

recovery of the regional population… The potential take is large enough to jeopardize the viability of the regional population, potentially fragmenting the remaining BNLL into three small sub-populations that will be highly unlikely to persist, given published models on the minimum fragment size for viable populations."); id. at 16 ("Any [blunt-nosed leopard lizard] population center in the Panoche Valley is therefore critical to the long-term persistence of the species and locating any development nearby or on such long-term population centers will jeopardize the long-term persistence of the species."); Bean Decl. ¶¶ 7, 9, 17, 26-27, 38 ("It is my professional opinion that the loss of part of the local [giant kangaroo rat] population and the net loss of this habitat will likely preclude recovery and will jeopardize the species."); 39 ("These activities, by eliminating high quality habitat and disrupting reproductive cycles at the most critical time in the past decade, threaten to permanently destroy an important colony of the giant kangaroo rat. The consequences of this loss … may have substantial and unmitigable impacts on the species that would forever preclude its recovery and de-listing.").[4]

Finally, the construction and operation of the Project will alter the aesthetic and ecological value of the Panoche Valley by converting an enormous expanse of what is presently bucolic grasslands into an industrialized area of densely packed solar panels. See, e.g., FEIS at 3-27 Fig. 3-3 ("the expansive solar fields would transform the existing rural landscape of Valley, with the introduction of the project's complex industrialized character sharply contrasting with the predominantly pastoral landscape setting of the valley and the predominantly natural appearance of the background hills and mountains."); 3-29 Fig. 3-4 (same); 3-35 (aesthetic impacts same as alternative discussed in 3-27 to 3-29) (Exh. N); Hirt Decl. ¶¶ 8–10.

Accordingly, absent a preliminary injunction, the Project will irreparably harm Plaintiffs' recreational, aesthetic, conservation, research, and professional interests in the protection of these endangered species as well as in the ecological integrity of the Panoche Valley. See Flick

---

[4] The declarations of experts Barry Sinervo, Ph.D. (Exh. M) and William "Tim" Bean, Ph.D. (Exh. P.) are submitted to support Plaintiffs' demonstration of irreparable harm and other equitable prongs of the preliminary injunction test. See Winter, 555 U.S. at 24-26 (reviewing extra-record declarations to weigh non-merits factors of preliminary injunction test).

Decl. ¶¶ 3, 8–10; Hirt Decl. ¶¶ 6,8–10; Diamond Decl. ¶¶ 6–10; Snyder Decl. ¶¶ 5–10; <u>Alliance for the Wild Rockies v. Cottrell</u>, 632 F.3d 1127, 1135 (9th Cir. 2011) (harm to plaintiffs' interests in their ability to "'view, experience, and utilize' [affected] areas in their undisturbed state" is an "actual and irreparable injury"); <u>Landwatch v. Connaughton</u>, 905 F. Supp. 2d 1192, 1197 (D. Or. 2012) (finding irreparable harm to "plaintiff and its members and supporters that use and enjoy the area at issue for its aesthetics, recreation such as hiking, camping, fishing and photography, as well as watershed research, education and observing wildlife"); <u>see also</u> <u>Sierra Club v. U.S. Army Corps of Eng'rs</u>, 645 F.3d 978, 995-96 (8th Cir. 2011) (finding harm to wildlife would irreparably injure plaintiffs' aesthetic interests and their interests in studying and enjoying the environment and protecting wildlife species).

## IV.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST SUPPORT AN INJUNCTION

Courts "do not have discretion to balance the parties' competing interests in ESA cases because Congress 'afford[ed] first priority to the declared national policy of saving endangered species.'" <u>Cottonwood</u>, 789 F.3d at 1090 (quoting <u>TVA v. Hill</u>, 437 U.S. at 185). "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities." <u>TVA v. Hill</u>, 437 U.S. at 194. The Ninth Circuit has emphasized, "[i]n Congress' view, projects that jeopardize the continued existence of endangered species threatened incalculable harm; accordingly, it decided that the balance of hardships and the public interest tip heavily in favor of endangered species." <u>Sierra Club v. Marsh</u>, 826 F.3d 1376, 1383 (9th Cir. 1987); <u>Wash. Toxics Coal. v. EPA</u>, 413 F.3d 1024, 1035 (9th Cir. 2005) ("The district court was not required to balance interests in protecting endangered species against the costs of the injunction when crafting its scope. Congress has decided that under the ESA, the balance of hardships always tips sharply in favor of the endangered or threatened species."). Serious questions concerning an ESA violation combined with likely harm to listed species, is a more than sufficient basis on which to issue an injunction.

Even if it were appropriate to consider countervailing impacts and the public interest, the facts here weigh in favor of an injunction. That an injunction may delay the Project or result in

financial harm does not weigh against issuing it. <u>Save Our Sonoran v. Flowers</u>, 227 F. Supp. 2d 1111, 1115 (D. Ariz. 2002), <u>aff'd</u> 381 F.3d 905, 914 (9th Cir. 2004) (project delay and possible financial loss did not offset environmental destruction); <u>Alaska Ctr. for the Env't v. West</u>, 31 F. Supp. 2d 711, 723 (D. Alaska 1998) (longer permit processing time was "not of consequence sufficient to outweigh irreversible harm to the environment"); <u>Seattle Audubon Soc'y v. Evans</u>, 771 F. Supp. 1081, 1096 (W.D. Wash. 1991), <u>aff'd</u> 952 F.2d 297 (9th Cir. 1991);  (unlike permanent environmental harm, "economic effects of an injunction are temporary and can be minimized in many ways").

In any case, to the extent delay results in some financial loss, courts have held that economic harm is not irreparable. <u>Sampson v. Murray</u>, 415 U.S. 61, 90 (1974); <u>Nat'l Parks Conservation Ass'n v. Babbitt</u>, 241 F.3d 722, 738 (9th Cir. 2001) ("loss of anticipated revenues … does not outweigh the potential irreparable damage to the environment"). Thus, where there is a threat of irreparable environmental harm, "more than pecuniary harm must be demonstrated" to avoid a preliminary injunction. <u>N. Alaska Envtl. Ctr. v. Hodel</u>, 803 F.2d 466, 471 (9th Cir. 1986) (finding irreparable environmental harm outweighed competing harm to miners despite potential for "real financial hardship"); <u>Save Our Sonoran v. Flowers</u>, 408 F.3d 1113, 1124–25 (9th Cir. 2005) (affirming preliminary injunction because, while developer "may suffer financial harm," without injunction, "unlawful disruption to the desert is likely irreparable"); <u>see also</u> <u>Wilderness Society v. Tyrrel</u>, 701 F. Supp. 1473, 1491 (E.D. Cal. 1998) ("economic loss cannot be considered compelling if it is to be gained in contravention of federal law").

Similarly, the Service and the Corps are not harmed by the suspension of their project approvals. Administrative burdens on government agencies do not outweigh the threat of irreparable harm to the environment. <u>Am. Motorcyclist Ass'n v. Watt</u>, 714 F.2d 962, 966 (9th Cir. 1983) ("harm to [County's] planning processes was not comparable to the harm enjoining the Plan would cause to the [environment] and the public interest"). Ensuring that governmental agencies comply with the law is a public interest of the "highest order." <u>Seattle Audubon Soc'y v. Evans</u>, 771 F. Supp. at 1096, <u>Earth Island Inst. v. U.S. Forest Serv.</u>, 351 F.3d 1291, 1308-09 (9th Cir. 2003); <u>Kootenai Tribe v. Veneman</u>, 313 F.3d 1094, 1125 (9th Cir. 2002); <u>Sierra Club v.</u>

1 | Eubanks, 335 F. Supp. 2d 1070, 1083–84 (E.D. Cal. 2004). Thus, it is in the public interest to

2 | ensure the Service and the Corps fully comply with federal law prior to project approval.

3 | **V.     NO BOND OR A MINIMAL BOND IS APPROPRIATE IN THIS CASE**

4 |     If the Court grants the requested preliminary injunction, Plaintiffs request that the Court

5 | waive the bond requirement or impose a nominal bond of no more than $500. <u>See</u> Fed. R. Civ. P.

6 | 65(c). Courts routinely waive the bond or impose only a nominal bond where the plaintiff is a

7 | public interest organization and a substantial bond "would effectively deny access to judicial

8 | review." <u>See, e.g.</u>, <u>California ex rel. Van de Kamp v. Tahoe Regional Planning Agency</u>, 766 F.2d

9 | 1319, 1325–26 (9th Cir. 1985), <u>amended on other grounds</u>, 775 F.2d 998 (9th Cir. 1985).

10 | **CONCLUSION**

11 |     Plaintiffs have demonstrated a likelihood of success on the merits and/or serious

12 | questions going to the merits. Plaintiffs will suffer irreparable harm if construction of the

13 | Panoche Valley Solar Project continues pursuant to Defendants' authorizations. For all of the

14 | reasons set forth above, Plaintiffs respectfully request that this Court grant their motion for a

15 | Temporary Restraining Order or, in the alternative, a Preliminary Injunction preserving the status

16 | quo until their claims can be resolved fully on the merits.

17 |     April 20, 2016               Respectfully submitted,

18 |                By:   /s/Jason C. Rylander

19 |                     DEFENDERS OF WILDLIFE

20 |                     Jason C. Rylander (DC Bar No. 474995)

21 |                     1130 17th Street, NW

22 |                     Washington, DC 20036
                    (202) 682-9400; Fax (202) 682-1331

23 |                     jrylander@defenders.org

24 |                     Appearance *pro hac vice* pending

25 |                     Rachel Zwillinger (CA Bar No. 268684)

26 |                     980 9th Street, Suite 1730
                    Sacramento, CA 95814

27 |                     415-686-2233; Fax (202) 682-1331
                    rzwillinger@defenders.org
                    *Attorneys for Plaintiffs*

28 |                     *Defenders of Wildlife, Sierra Club, and*
                    *Santa Clara Valley Audubon Society*

**LIST OF EXHIBITS**

A.    U.S. Fish & Wildlife Serv., Reinitiation of Formal Consultation for the Panoche Valley Solar Farm, San Benito County, California (File Number 2009-00443S), March 8, 2016

B.    U.S. Fish & Wildlife Serv., Draft Biological Opinion, August 21, 2015

C.    Letter from Stephen P. Henry, Field Supervisor, to Michael S. Jewell, Chief, Regulatory Divisions, Aug. 21, 2015

D.    Letter from Stephen P. Henry, Field Supervisor, to Michael S. Jewell, Chief, Regulatory Divisions, October 5, 2015

E.    Letter from Jason Rylander, Defenders of Wildlife to Sally Jewell, Secretary of the Interior and John McHugh, U.S. Army Corps of Eng'rs, Dec. 23, 2015; Letter from Jason Rylander to Eric Charniss, Panoche Valley Solar, LLC, Dec. 23, 2015

F.    U.S. Army Corps of Eng'rs, Record of Decision, Action ID SPN-2009-00443, Mar. 31, 2016 (ROD)

G.    Department of the Army Permit SPN-2009-00443, Mar. 25, 2016

H.    Excerpts of U.S. Fish & Wildlife Serv., Recovery Plan for Upland Species of the San Joaquin Valley, California, at Table 5 (1998)

I.    Declaration of Pamela Flick

J.    Declaration of Bob Hirt

K.    Declaration of Tanya Diamond

L.    Declaration of Ahíga Roger Snyder

M.    Declaration of Barry Sinervo, PhD.

N.    Letter from Dr. Barry Sinervo to Lisa Gibson, Oct. 26, 2015

O.    Letter from Dr. William "Tim" Bean to Lisa Gibson, Oct. 23, 2015

P.    Declaration of William "Tim" Bean, PhD.

Q.    Excerpts of Final Environmental Impact Statement (FEIS) for the Panoche Valley Solar Project, Dec. 31, 2015

R.    Declaration of Jason C. Rylander

S.    Complaint

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the attached Notice of Motion and Motion for Temporary Restraining Order and/or Preliminary Injunction; Memorandum of Points and Authorities in Support Thereof was filed on April 20, 2016 using this Court's CM/ECF system, such that service was accomplished upon counsel of record by the Court's system.

 s/  Jason C. Rylander

Jason C. Rylander

NOTICE OF MOTION AND MOTION FOR TRO          AND/OR PRELIMINARY INJUNCTION; MPA
CASE NO. 5:16-cv-1993 NC