1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

DEFENDERS OF WILDLIFE, et al.,

        Plaintiffs,

    v.

U.S. FISH AND WILDLIFE SERVICE, et al.,

        Defendants.

Case No. 16-CV-01993-LHK

**ORDER DENYING MOTION FOR A PRELIMINARY INJUNCTION**

Re: Dkt. No. 24

Plaintiffs Defenders of Wildlife, Sierra Club, and Santa Clara Valley Audubon Society (collectively, "Plaintiffs") challenge the actions of Defendants U.S. Fish and Wildlife Service ("FWS") and U.S. Army Corps of Engineers (the "Corps") (collectively, "Federal Defendants") with respect to the development of a solar facility in the Panoche Valley of California. The developer of the proposed solar facility, Panoche Valley Solar, LLC ("PVS") (together with FWS and Corps, "Defendants"), intervened as a defendant. ECF No. 28. Before the Court is Plaintiffs' motion for a temporary restraining order or a preliminary injunction. ECF No. 24. The Court held a hearing on this matter on May 20, 2016. Having considered the oral arguments at the hearing, the submissions of the parties, the relevant law, and the record in this case, the Court hereby DENIES Plaintiffs' motion for a preliminary injunction.

1

United States District Court
Northern District of California

# I.   BACKGROUND

## A.   Regulatory Framework

### 1.   Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*

The ESA contains both substantive and procedural provisions designed to protect species listed under the ESA as threatened or endangered.  *See Forest Guardians v. Johanns*, 450 F.3d 455, 457 (9th Cir. 2006).  Three interlocking provisions of the ESA are of particular significance here: Sections 9, 7, and 10.  Section 9 prohibits the "take" of any member of a listed species.  16 U.S.C. § 1538(a)(1)(B).  To "take" a listed species means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  *Id.* § 1532(19).  Notwithstanding that prohibition, private parties such as PVS may obtain authorization for "incidental take"[1] of listed species in two ways: (1) through Section 7, for projects authorized, funded, or carried out by a federal agency; or (2) through Section 10, for projects carried out entirely by the private party.  Federal agencies such as the Corps may obtain authorization for incidental take only through Section 7.

Specifically, Section 7(a)(2) governs federal agency actions in which "there is discretionary Federal involvement or control."  50 C.F.R. § 402.03.  This section requires a federal agency such as the Corps to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species."  16 U.S.C. § 1536(a)(2).

Section 7(b) sets forth the process of consultation, which determines whether an agency action is likely to jeopardize listed species.  *Id.* § 1536(b).  If the federal agency proposing an action determines that the proposed action "may affect" a listed species or critical habitat, the agency must engage in either informal or formal consultation with FWS.[2]  50 C.F.R. § 402.14(a).  Formal consultation is ordinarily required if the federal agency concludes that listed species are

---

[1] Incidental take "refers to takings that result from, but are not the purpose of, carrying out an otherwise lawful activity."  50 C.F.R. § 402.02.

[2] FWS administers the ESA with respect to all species aside from marine species.  50 C.F.R. § 402.01(b).  Actions that may affect marine species require consultation with the National Marine Fisheries Service rather than FWS.  *Id.*; *see also Forest Guardians*, 450 F.3d at 457 n.1.

Case No. 16-CV-01993-LHK
ORDER DENYING MOTION FOR A PRELIMINARY INJUNCTION

likely to be adversely affected.  *See Forest Guardians*, 450 F.3d at 457; *see also W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011) (noting that "may affect" has been interpreted broadly to mean "any possible effect, whether beneficial, benign, adverse, or of an undetermined character" (alteration omitted)).

Formal consultation requires FWS to produce a "biological opinion" according to the "best scientific and commercial data available."  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14.  The biological opinion evaluates "whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat."  50 C.F.R. § 402.14(g)(4).  If FWS concludes that jeopardy is likely, then the action must be modified or any take resulting from the action is subject to Section 9 liability.  *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt. ("BLM")*, 698 F.3d 1101, 1107 (9th Cir. 2012).

Alternatively, as occurred in the instant case, if FWS concludes that the proposed action is not likely to result in jeopardy but will incidentally take members of a listed species, FWS includes an "incidental take statement" with the biological opinion.  50 C.F.R. § 402.14(i).  The incidental take statement must specify the amount or extent of authorized take, any "reasonable and prudent measures that [FWS] considers necessary or appropriate to minimize such impact," and the mandatory terms and conditions to implement the reasonable and prudent measures.  16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).  Compliance with the terms and conditions of an incidental take statement shields the agency undertaking the action from Section 9's prohibition against take of listed species.  16 U.S.C. § 1536(o); *Or. Nat. Res. Council v. Allen*, 476 F.3d 1031, 1034 (9th Cir. 2007) ("[A] BiOp with a no-jeopardy finding effectively green-lights the proposed action under the ESA, subject to the Incidental Take Statement's terms and conditions.").  Thus, while the agency "is technically free to disregard the Biological Opinion and proceed with its proposed action, . . . it does so at its own peril."  *Bennett v. Spear*, 520 U.S. 154, 170 (1997).  In addition, where the agency's action involves authorization or approval of private party conduct, then the private party is also protected from Section 9 by compliance with the agency's incidental

3

take statement.

For projects that do not require authorization or funding from a federal agency, Section 10 allows a private party to seek an incidental take permit directly from FWS.  16 U.S.C. § 1539(a)(1)(B).  To receive a Section 10 permit, the applicant must submit a comprehensive conservation plan that provides for mitigation efforts that minimize the project's future impact on listed species.  50 C.F.R. § 17.22(b)(1)(iii).  FWS may issue the permit only after affording the opportunity for public comment on the conservation plan.  *Id.* § 17.22.  If take is not permitted pursuant to Section 10 or a Section 7 consultation, a developer who undertakes activities that result in the take of listed species may be subject to criminal and civil federal enforcement actions, as well as civil citizen suits.  *See* 16 U.S.C. § 1540.

### 2.    Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.*

The CWA is designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  To do so, the CWA generally prohibits the discharge of pollutants, including dredged or fill material, into the waters of the United States unless authorized by a permit.  *Id.* § 1311(a); *see also* 40 C.F.R. § 230.3.  Section 404 of the CWA authorizes the Secretary of the Army, through the Corps, to issue permits for the discharge of such dredged or fill material into waters of the United States.  33 U.S.C. § 1344.

Section 404 permits must comply with regulations promulgated by the Corps and the U.S. Environmental Protection Agency, known as the "Section 404(b)(1) Guidelines" or "Guidelines."  33 C.F.R. §§ 320.4(b)(4), 320.4(r)(1)(ii), 325.2(a)(6); *see also* 40 C.F.R. § 230 *et seq*. (Guidelines).  The Guidelines prohibit the Corps from authorizing a permit if the proposed activity "[j]eopardizes the continued existence" of a listed species.  40 C.F.R. § 230.10(b)(3).  The Guidelines further explain that where Section 7 consultation has occurred, the Corps' determination of whether an activity jeopardizes the continued existence of a listed species is determined by the outcome of the consultation process.  *Id.* § 230.30(c).  In addition, separate from the Guidelines, the Corps must conduct a public interest review in which the Corps balances the "benefits which reasonably may be expected to accrue" against the project's "reasonably

Case No. 16-CV-01993-LHK
ORDER DENYING MOTION FOR A PRELIMINARY INJUNCTION

United States District Court
Northern District of California

foreseeable detriments." 33 C.F.R. § 320.4(a).  A permit must be denied if it is contrary to the public interest or does not comport with the Guidelines.  *Id.*

### 3.   National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*

NEPA "is our basic national charter for protection of the environment."  *Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1012 (9th Cir. 2009).  NEPA "is a procedural statute that does not mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions." *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 639 (9th Cir. 2004) (internal quotation marks omitted).  NEPA requires a federal agency to prepare a detailed environmental impact statement for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(c).

"Major federal actions" include permits issued by the Corps pursuant to Section 404 of the CWA.  *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1121 (9th Cir. 2004); *see also* 40 C.F.R. § 1508.18(a).  Under NEPA, the Corps must determine the potential impact that a proposed project would have on United States' waters as well as on "those portions of the entire project over which the district engineer has sufficient control and responsibility to warrant Federal review."  33 C.F.R. 325 App. B § 7(b)(1).  The Corps has "control and responsibility" for portions of the project in which "the Federal involvement is sufficient to turn an essentially private action into a Federal action.  These are cases where the environmental consequences of the larger project are essentially products of the Corps permit action."  *Id.* § 7(b)(2).

### B.  Factual Background

#### 1.   Proposed Project and Threatened Species

PVS proposes to develop and operate a solar energy project in the ecologically sensitive Panoche Valley in San Benito County.  When PVS first advanced this project in 2009, PVS proposed a 1,000 megawatt solar facility built on 10,000 acres.  *See* ECF No. 40-1 (project description).  Now, PVS proposes a 247-megawatt solar facility comprised of approximately 1,529 acres of photovoltaic panels installed on a 2,154 acre project site.  ECF No. 24-1, Reinitiation of

Case No. 16-CV-01993-LHK
ORDER DENYING MOTION FOR A PRELIMINARY INJUNCTION

United States District Court
Northern District of California

Formal Consultation for the Panoche Valley Solar Farm ("2016 BiOp"), at 8. The project will also include electricity collection lines, roads, fences, interconnection facilities, and operation and maintenance buildings. Construction is expected to take approximately 18 months while operation and maintenance of the solar facility is expected to last 30 years. *Id.* As designed, the project will result in the discharge of dredged or fill material into 0.121 acres of United States' waters. ECF No. 59-3 to -4, Corps' Revised Record of Decision ("Revised ROD"), at 1. This discharge is required to provide stream crossings that are necessary for fire breaks and for emergency vehicles to access the project site. ECF No. 68 ("May 20 Tr."), at 27.

The Panoche Valley is home to a variety of ESA-listed species, including the blunt-nosed leopard lizard, the San Joaquin kit fox, and the giant kangaroo rat. Each of these species has been in decline due to loss of habitat and the fragmentation of existing habitat into smaller, unconnected pieces. Revised ROD at 10–11; 2016 BiOp at 43. The blunt-nosed leopard lizard, specifically, has been listed as endangered since 1967 and currently survives in less than 15% of its historic geographic range. 2016 BiOp at 46–47. The San Joaquin kit fox also has been listed as endangered since 1967 and survives in less than 20% of its historic range. *Id.* at 43. Similarly, the giant kangaroo rat has been listed as endangered since 1987 and survives in less than 5% of its historic range. *Id.* at 35, 39.

To reduce the impacts of the solar project on the blunt-nosed leopard lizard, San Joaquin kit fox, and giant kangaroo rat, the proposed solar project includes a variety of avoidance and conservation measures. *Id.* at 22–34. For example, the project was designed to avoid areas with high densities of listed species. In addition, PVS proposes to hire FWS-approved biologists to monitor construction work, and to require all project personnel to participate in an environmental education program to learn to identify and protect listed species. *Id.* at 22–23. As a species-specific example, the "Giant Kangaroo Rate Relocation Plan" involves trapping the giant kangaroo rats living on the project site and relocating the giant kangaroo rats to nearby habitat with inactive or artificial burrows "provisioned with seed reserves." *Id.* at 27; 68–69. PVS will not begin construction until an FWS-approved biologist determines that no more giant kangaroo

6

United States District Court
Northern District of California

United States District Court
Northern District of California

1    rats are expected to use the project site.  *Id.* at 27.

2          Further, PVS committed to the acquisition and permanent protection of 25,618 acres of

3    existing habitat.  PVS has already purchased over 24,000 acres of conservation land in three

4    primary areas: Valley Floor Conservation Lands (2,514 acres), Valadeao Ranch Conservation

5    Lands (10,772 acres), and Silver Creek Ranch Conservation Lands (10,890 acres).  *Id.* at 32, 34,

6    97–98; *see also* ECF No. 43 ¶ 28 (declaration that the lands have been purchased).  These lands

7    are contiguous to or near the project site and consist of generally suitable habitat that was privately

8    owned.  The Valley Floor Conservation Lands provide a corridor of habitat connecting the

9    conservation lands and allowing listed species to move through the project site.  2016 BiOp at 97.

10   The Silver Creek Ranch Conservation Lands are considered of particularly high habitat value and

11   their protection was previously identified as important to the recovery of blunt-nosed leopard

12   lizards and giant kangaroo rats.  *Id.* at 98 (citing FWS's 1998 Recovery Plan for Upland Species of

13   the San Joaquin Valley).

14         The conservation lands will be preserved in perpetuity with endowments to the Center for

15   Natural Lands Management and managed "to provide a sufficient population level of special status

16   species to offset the effects of construction of the project."  *Id.* at 34; *see also* ECF No. 43-13

17   (recordation of conservation easement).  In addition, PVS has committed to purchase 1,000

18   additional acres of "high-quality, in-kind habitat" for the giant kangaroo rat, as required by an

19   incidental take permit issued by the California Department of Fish and Wildlife ("CDFW").  ECF

20   No. 40-2 (excerpt from CDFW's incidental take permit); *see also* 2016 BiOp at 32–33.  The exact

21   location of this additional acreage is unknown.  *Id.*

22         **2.  History of Consultation and the Corps' Jurisdiction**

23         Because the project requires discharge of dredged or fill material into United States'

24   waters, PVS sought a Section 404 permit from the Corps.  The Corps determined that the proposed

25   discharge may adversely affect listed species, and on August 12, 2010, requested formal

26   consultation with FWS pursuant to Section 7 of the ESA.  The Corps also undertook the creation

27   of an environmental impact statement pursuant to NEPA.  After multiple changes in project

28

7

1    ownership and project design, FWS initiated formal consultation on November 20, 2014.

2        On August 15, 2015, FWS provided a draft biological opinion ("Draft BiOp") to the Corps

3    for comments.  ECF No. 24-2.  The Draft BiOp concluded that the proposed project was not likely

4    to jeopardize the survival and recovery of the blunt-nosed leopard lizard, San Joaquin kit fox, and

5    giant kangaroo rat.  *Id.* at 89–94.  Accordingly, the Draft BiOp included a draft incidental take

6    statement authorizing limited take of blunt-nosed leopard lizards, San Joaquin kit foxes, and giant

7    kangaroo rats during the proposed project's construction.  *Id.* at 96–105; *see Or. Nat. Res.*

8    *Council*, 476 F.3d at 1036 ("[T]he Incidental Take Statement's primary function is to authorize the

9    taking of animals incidental to the execution of a particular proposed action.").  Because the

10   incidental take statement was limited to construction of the proposed project, any take of species

11   incidental to the operation and maintenance of the proposed project would not be exempt from

12   liability under Section 9 of the ESA.

13       FWS limited the draft incidental take statement to construction of the proposed project due

14   to concerns over the extent of the Corps' jurisdiction.  In a letter accompanying the Draft BiOp,

15   FWS noted that the Corps "has determined that the entirety of the project cannot proceed but for

16   the impacts to the Corps' jurisdictional waters" and the Corps' "permit area" is "the entire project

17   site."  ECF No. 24-3.  However, FWS explained, the Corps also had stated that "the Corps'

18   jurisdiction is limited to the 'waters of the United States'" and "the Corps lacks authority and

19   jurisdiction over any activities beyond construction" such as "operation, maintenance, and

20   decommissioning of the project."  *Id.* at 2–3.  FWS asked the Corps to "define the extent of the

21   Corps' jurisdiction and discretionary authority, both geographically and temporally, for the

22   purposes of this formal consultation."  *Id.* at 2.

23       In the Draft BiOp, FWS went into further detail about the discrepancy between the Corps'

24   stated jurisdiction and the scope of the Draft BiOp.  As this is relevant to the issues before the

25   Court, the Draft BiOp is quoted at length:

26       This project and the Corps' authorization pose issues regarding the extent of our
         analysis of the effects of the action and the scope of the exemption to the take
27       prohibitions identified in this Incidental Take Statement.  *The Corps has included*

Case No. 16-CV-01993-LHK
ORDER DENYING MOTION FOR A PRELIMINARY INJUNCTION

United States District Court
Northern District of California

*the entire 2,506-acre project area in its scope of analysis under National Environmental Policy Act (NEPA), but advises that its authorization would affect only 0.122 acre of waters of the U.S. and that its discretionary authority and control over the project would end when the fill and associated activities are completed* (i.e., when the project is constructed), which the Applicant estimates to be within 18 months. . . .

However, without the discretionary authority required pursuant to section 7(a)(2) of the Act, Reasonable and Prudent Measures and Terms and Conditions to minimize the effects of take resulting from operation and maintenance of the project are not enforceable by the Corps and the Corps has stated that it lacks such authority and jurisdiction over any activities beyond project construction. . . . *Because the Corps has determined that it lacks the authority and jurisdiction in the first instance over operation, maintenance, and decommissioning or repowering of the project, including take likely to result from operation, maintenance, and decommissioning or repowering activities, there is no scenario under which the Corps would enforce non-discretionary measures to minimize the impacts of take resulting from operation, maintenance, and decommissioning or repowering; or comply with the duty to reinitiate consultation under 50 CFR 402.16 if any reinitiation trigger is met*, including if the anticipated level of take is exceeded. The take exemption provided under section 7(o) of the Act applies to the Federal action (i.e., the action over which the Corps possesses discretionary control or jurisdiction). Therefore, the incidental take exempted for this Federal action . . . is *co-extensive with and limited to the scope of the Federal action under review, which is construction of the proposed solar project.*

Draft BiOp at 3–4 (emphases added). In other words, FWS explained that because the Corps defined the federal "action" as "construction of the proposed solar project," the Corps and PVS would be exempt from Section 9's prohibition on take only for construction of the project. For parts of the project outside of the Corps' responsibility, including operation and maintenance of the project, FWS advised that PVS would need to seek an incidental take permit directly from FWS under Section 10.

The Corps responded to the Draft BiOp and FWS's letter on August 28, 2015. The Corps noted that its jurisdiction is limited "to areas on the proposed project site meeting the definition of waters of the United States" but confirmed that the "construction of the entire project is interrelated to the Corps' statutory authority under Section 404." ECF No. 43-6. The Corps advised FWS that the Corps considered the entire project site to be the relevant "action area" and that FWS should address the operation and maintenance of the project as well as construction. ECF No. 43-6. The Corps also promised that the terms and conditions of FWS's biological opinion would become binding on PVS, and enforceable by the Corps, through conditions in

9

PVS's Section 404 Permit. *Id.* (noting the incidental take statement "would become binding on the applicant for the life of the project through a permit issued by this office. . . . The Corps will include a special condition in any permit, if issued, requiring the applicant to adhere to the [Biological Opinion]"); ("The [Biological Opinion] is enforceable through a special condition under any permit issued to the applicant.").

On October 5, 2015, after receiving comments from the Corps, FWS issued a final biological opinion ("2015 BiOp") concluding that the proposed solar project is not likely to jeopardize the survival and recovery of the blunt-nosed leopard lizard, the San Joaquin kit fox, and the giant kangaroo rat.  The 2015 BiOp is not in the record before the Court.

Upon receipt of the 2015 BiOp, on December 23, 2015, Plaintiff Defenders of Wildlife sent the Corps and FWS a 60-day notice letter of intent to sue.  Defenders of Wildlife sought reinitiation of consultation because FWS had allegedly failed to consider various expert opinions and other relevant materials when drafting the 2015 BiOp.  ECF No. 24-5, Ex. 1.  Defenders of Wildlife also wrote to PVS explaining that no take of listed species could occur unless the terms and conditions of a valid incidental take statement were incorporated into a Section 404 permit or PVS received an incidental take permit pursuant to Section 10 of the ESA.  ECF No. 24-5, Ex. 2.

On January 20, 2016, the Corps requested reinitiation of formal consultation with FWS due to changes in the project design, including the proposed purchase of 1,000 additional acres of giant kangaroo rat habitat.  ECF No. 40-1.  The reinitiation of formal consultation resulted in the 2016 BiOp challenged in the instant suit and discussed in the next section.

### 3.  March 8, 2016 Biological Opinion

In the 2016 BiOp, FWS again concluded that the proposed project is not likely to jeopardize the survival and recovery of the blunt-nosed leopard lizard, the San Joaquin kit fox, and the giant kangaroo rat.  Unlike the Draft BiOp, which was limited to construction of the proposed project, the 2016 BiOp explained that the "Federal action under review . . . is construction, operation, and maintenance of the proposed solar project."  *Id.* at 5; *see also id.* at 4 (noting that the Corps "has included the entire 2,154-acre project area and compensatory mitigation activities

Case No. 16-CV-01993-LHK
ORDER DENYING MOTION FOR A PRELIMINARY INJUNCTION

United States District Court
Northern District of California

1   in its scope of analysis under [NEPA]" and analyzed the "direct and indirect effects of

2   construction and operation and maintenance of the project following construction").  Accordingly,

3   the 2016 BiOp evaluated the impact of the entire project for the life of the project.

4          To conclude that the project would not jeopardize the survival and recovery of listed

5   species, FWS acknowledged that the project would permanently impact 1,688 acres of suitable

6   habitat for the blunt-nosed leopard lizard, San Joaquin kit fox, and giant kangaroo rat.  *Id.* at 65.

7   In addition, 466 acres of habitat would be temporarily impacted.  *Id.*  However, FWS found that

8   "the inclusion in the proposed action of permanent protection and management of the conservation

9   lands for the benefit of federally listed species" is consistent with the high value of habitat in the

10  Panoche Valley to the recovery of the listed species.  *Id.* at 97.  FWS concluded that the permanent

11  protection and management of the proposed conservation lands "is expected to maintain or

12  minimally increase the numbers of giant kangaroo rats, San Joaquin kit foxes, and blunt-nosed

13  leopard lizards" and "further recovery efforts."  *Id.*

14         As to the giant kangaroo rat specifically, FWS found that the "Panoche Valley Solar Farm,

15  as proposed, is not likely to jeopardize the continued existence of the giant kangaroo rat" and "the

16  effects on recovery are expected to be minimal due to the preservation and management of

17  important habitat specifically for the species consistent with recovery efforts."  *Id.* at 101; *see also*

18  *id.* at 77 ("Although some occupied and suitable habitat would be removed and mortality of some

19  [] individuals is expected, implementation of the proposed project would have minimal effect on,

20  and would not impede recovery of the species due to preservation of important occupied habitat in

21  the conservation lands and the capture and relocation measures incorporated into the project to

22  minimize mortality to giant kangaroo rats.").

23         As to the San Joaquin kit fox, FWS noted the value of the conservation lands in addition to

24  the "numerous measures" proposed by PVS "to avoid injuring or killing individual San Joaquin kit

25  foxes."  *Id.* at 101–02 ("With the protection of lands to the north and south of the project site and

26  the habitat corridor . . . through the project footprint, the function of the Ciervo-Panoche Natural

27  Area will be maintained as an important recovery area for [the] San Joaquin kit fox and the

28

Case No. 16-CV-01993-LHK
ORDER DENYING MOTION FOR A PRELIMINARY INJUNCTION

United States District Court
Northern District of California

1   proposed project will not impede recovery of the species rangewide.").

2       Similarly, FWS found the project unlikely to jeopardize the blunt-nosed leopard lizard due

3   to proposed measures to minimize the negative effects of the project, including avoidance of areas

4   occupied by blunt-nosed leopard lizards and the "preservation and management of lands

5   specifically for the conservation of the species." *Id.* at 103–04.  Whether the 2016 BiOp properly

6   relied upon these conservation measures as mitigating the adverse effects of the project on the

7   three listed species is one of the central issues in the instant motion.

8       Because FWS concluded that the proposed project is not likely to jeopardize the listed

9   species, FWS issued an incidental take statement authorizing limited take of the listed species

10   during the construction, operation, and maintenance of the proposed project.  *Id.* at 105–20.  FWS

11   also set out numerous terms and conditions to minimize the anticipated take, which FWS

12   explained are "non-discretionary, and must be undertaken by the Corps or made binding

13   conditions of any grant or permit issued to [PVS], as appropriate."  *Id.* at 106; *see also id.* at 116–

14   17 ("The Corps must include all measures, plans, conditions, and reporting requirements in . . .

15   this biological opinion as binding terms and conditions of any and all permits it issues for the

16   Project and must monitor and enforce their implementation.").  The terms and conditions of the

17   2016 BiOp include the implementation of "all proposed conservation measures, plans, and

18   easements." *Id.* at 117.  FWS explained that if the Corps does not require PVS's compliance with

19   the terms and conditions through "enforceable terms that are added to [PVS's] permit," the

20   protection from Section 9 liability may lapse.  *Id.* at 106.

21   **4.  Corps' Original Section 404 Permit**

22       Based on the 2016 BiOp, the Corps issued a permit pursuant to Section 404 (the "Original

23   Permit") on March 25, 2016, and a Record of Decision on March 31, 2016.  Although the Corps

24   had represented to FWS in August 2015 that "[t]he Corps will include a special condition in any

25   permit, if issued, requiring the applicant to adhere to the [Biological Opinion]," the Original

26   Permit incorporated only those parts of the 2016 BiOp "related to the Corps' jurisdiction."  ECF

27   No. 25-1.  The Original Permit then limited the Corps' jurisdiction to "construction activities" that

28

are "within the 0.121 acres of the U.S. that would be filled, upland areas adjacent to the waters of the U.S. that would be filled, as well as upland access and staging areas." *Id.* at 6–7. Thus, the Corps incorporated only a small number of the terms and conditions of the 2016 BiOp into the Original Permit. *See id.*; *see also* ECF No. 24-6 (Original Record of Decision), at 22.

### 5. Corps' Revised Section 404 Permit

In response to the instant motion, the Corps agreed to modify the Original Permit "to expressly assume responsibility for ensuring PVS's compliance with all of the requirements of the BiOp, for the entire project area, during the estimated 30-year duration of the project." ECF No. 39 ("Fed. Opp."), at 11. The Corps noted that "[i]t is relevant that the Corps consulted with [FWS] regarding the entire project area." *Id.* at 10 n.8. In a letter sent to PVS on May 4, 2016, the Corps explained that "[t]he Corps is taking broader responsibility for the implementation of the Biological Opinion because of the unique history of this permitting action and the concerns raised by the public. This broad scope is not reflective of how the Corps will treat other sites, absent special circumstances." EC No. 39-1.

On May 17, 2016, the Corps filed a revised Section 404 permit with the Court. ECF No. 59-2 ("Revised Permit"). The Revised Permit states that "[c]ompliance with all terms and conditions in the Biological Opinion are binding conditions of this permit to the full geographic and temporal extent that the exemption from the prohibition on take pursuant to the Endangered Species Act, Section 7(o)(2), is provided by the Biological Opinion. The Corps, in coordination with the U.S. Fish and Wildlife Service, will monitor your implementation of the Biological Opinion over the 30 year life of the project to ensure your compliance with the terms and conditions therein. Failure to comply with the terms and conditions of the Biological Opinion would constitute non-compliance with this Corps permit . . . ." *Id.* at 6–7.

### C. Procedural History of the Instant Suit

Plaintiff filed suit on April 15, 2016. ECF No. 1. Counts one and two of the complaint allege that FWS violated the ESA when creating the 2016 BiOp. *Id.* ¶¶ 125–53. Plaintiffs' third cause of action alleges that the Corps violated the CWA by relying on the faulty 2016 BiOp, while

13

United States District Court
Northern District of California

1    the fourth cause of action claims that the Corps failed to consider practicable alternatives to the

2    project site in the Panoche Valley.  *Id.* ¶¶ 154–70.  As a result, Plaintiffs ask the Court to vacate

3    and set aside the 2016 BiOp and any permit under Section 404.  *Id.* ¶ 171.  PVS moved to

4    intervene on April 19, 2016, ECF No. 18, which the Court granted on April 20, 2016, ECF No. 28.

5           Plaintiffs moved for preliminary injunctive relief as to the first three causes of action on

6    April 20, 2016.  ECF No. 24.  Upon this action's reassignment on April 20, 2016, the Court set an

7    expedited hearing for May 20, 2016.  ECF No. 34.  Federal Defendants filed a response on May 4,

8    2016, ECF No. 39, as did PVS, ECF No. 41 ("PVS Opp.").  Plaintiffs replied on May 11, 2016.

9    ECF No. 53 ("Reply").  On May 17, 2016, PVS objected to the reply evidence offered by

10   Plaintiffs.  ECF No. 60.

11          On May 18, 2016, the Court filed questions for the parties to answer in writing by May 20,

12   2016.  ECF No. 62.  On May 20, 2016, Plaintiffs and Federal Defendants filed supplemental briefs

13   answering the questions posed by the Court.  ECF No. 63 ("Pl. Supp. Br."); ECF No. 64 ("Fed.

14   Supp. Br.").  Also on May 20, 2016, the Court held a hearing on the instant motion.

15   **II.     LEGAL STANDARD**

16       **A. Preliminary Injunctive Relief**

17          The standard for issuing a temporary restraining order is identical to the standard for

18   issuing a preliminary injunction.  *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832,

19   839 n.7 (9th Cir. 2001).  Preliminary relief is an "extraordinary remedy that may only be awarded

20   upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council,*

21   *Inc.*, 555 U.S. 7, 22 (2008).  "A plaintiff seeking a preliminary injunction must establish [1] that

22   he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence

23   of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is

24   in the public interest."  *Id.* at 20.  "[T]he decision whether to grant or deny injunctive relief rests

25   within the equitable discretion of the district courts," and "such discretion must be exercised

26   consistent with traditional principles of equity."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S.

27   388, 394 (2006).

28

14

**B.  Actions under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.***

The general review provisions of the APA apply in cases asserting violations of the ESA and the CWA.  *Kraayenbrink*, 632 F.3d at 481 (ESA); *Jones v. Nat'l Marine Fisheries Serv.*, 741 F.3d 989, 996 (9th Cir. 2013) (CWA).  Under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  *See* 5 U.S.C. § 702.  An agency action may be set aside under the APA only if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  *See id.* § 706(2)(A).

"To determine whether agency action is arbitrary or capricious, a court must consider 'whether the decision was based on a consideration of the relevant factors and whether there has been clear error of judgment.'"  *Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)); *see also Pac. Coast Fed'n of Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001) ("Agency action should be overturned only when the agency has 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'").  This standard is a "deferential" one.  *Sierra Club v. Bosworth*, 510 F.3d 1016, 1022 (9th Cir. 2007).  Nonetheless, "to withstand review the agency must articulate a rational connection between the facts found and the conclusions reached."  *Id.* at 1023 (brackets and internal quotation marks omitted).  Courts "will defer to an agency's decision only if it is 'fully informed and well-considered.'"  *Id.* (quoting *Save the Yaak Comm. v. Block*, 840 F.2d 714, 717 (9th Cir. 1988)).

**III.     EVIDENTIARY OBJECTIONS**

**A.  Consideration of Extra-Record Declarations**

Plaintiffs submit declarations by Dr. Barry Sinervo ("Sinervo") and Dr. William Bean ("Bean") in support of the instant motion.  ECF No. 27-1 ("Sinervo Decl."), ECF No. 26-3 ("Bean

15

1  Decl.").  Sinervo and Bean are recognized scientific experts on the blunt-nosed leopard lizard and

2  giant kangaroo rat, respectively.  Sinervo Decl. ¶ 5; Bean Decl. ¶ 3–4.  In addition, both scientists

3  submitted comments on the proposed project to the Corps during the consultation process, and the

4  research of both scientists is referenced in the 2016 BiOp.  *See, e.g.*, ECF No. 26-1 (Sinervo

5  Letter); ECF No. 26-2 (Bean Letter).  Federal Defendants object to Plaintiffs' citations to the

6  extra-record Bean and Sinervo declarations to demonstrate a likelihood of success on the merits.

7  Fed. Opp. at 12.

8      Review under the APA generally is restricted to the administrative record.  *See, e.g.*, *Ariz.*

9  *Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1236 (9th Cir. 2001) ("The

10  reviewing court may not substitute reasons for agency action that are not in the record."); 5 U.S.C.

11  § 706 ("[T]he court shall review the whole record or those parts of it cited by a party . . . .").

12  However, the Court may consider materials outside the administrative record "(1) if necessary to

13  determine whether the agency has considered all relevant factors and has explained its decision,

14  (2) when the agency has relied on documents not in the record, . . . (3) when supplementing the

15  record is necessary to explain technical terms or complex subject matter, [or] . . . (4) when

16  plaintiffs make a showing of agency bad faith."  *Ctr. for Biological Diversity v. U.S. Fish &*

17  *Wildlife Serv. ("Ctr. for Biological Diversity")*, 450 F.3d 930, 943 (9th Cir. 2006) (second ellipsis

18  in original).  "Keeping in mind the Supreme Court's concerns with reviewing court factfinding,

19  [the Ninth Circuit] ha[s] approached these exceptions with caution, lest 'the exception . . .

20  undermine the general rule.'"  *San Luis & Delta-Mendota Water Auth. v. Jewell ("San Luis I")*,

21  747 F.3d 581, 603 (9th Cir. 2014) (ellipsis in original).

22      Federal Defendants do not contest that the Sinervo and Bean declarations are permissible

23  under the third exception to the extent that the declarations define scientific terms or explain

24  technical material in the 2016 BiOp.  *See id.* ("[W]e can see no reasonable objection to the use of

25  experts to explain the highly technical material in the BiOp.").  The Court utilizes the Sinervo and

26  Bean declarations for this purpose.

27      The Sinervo and Bean declarations are also arguably permissible "to determine whether the

28

Case No. 16-CV-01993-LHK
ORDER DENYING MOTION FOR A PRELIMINARY INJUNCTION

United States District Court
Northern District of California

agency has considered all relevant factors." *Ctr. for Biological Diversity*, 450 F.3d at 943.  Under this exception, the Court may examine expert declarations "to develop a background against which it can evaluate the integrity of the agency's analysis." *San Luis & Delta-Mendota Water Auth. v. Locke ("San Luis II")*, 776 F.3d 971, 993 (9th Cir. 2014).  Here, in order for Plaintiffs to argue that FWS ignored the best available scientific data, Plaintiffs must be able to identify and describe the omitted data.  While expert declarations may be permissible for this purpose, however, the Court may not "use extra-record evidence to judge the wisdom of the agency's action" nor "look to this evidence as a basis for questioning the agency's scientific analyses or conclusions." *Id.* ("Even if a reviewing court properly admits extra-record evidence . . . it may not *use* the admitted extra-record evidence to determine the correctness or wisdom of the agency's decision." (internal quotation marks omitted)).  "This distinction is a fine, but important, one." *Id.*

Plaintiffs (and Defendants) have submitted documentary evidence relevant to whether FWS used the best available scientific data in developing the 2016 BiOp, including the letters sent by Sinervo and Bean to the Corps during the consultation process.  These letters describe Sinervo's and Bean's research, as do letters sent to the Corps and FWS by environmental organizations.  *See, e.g.*, ECF No. 24-5, December 23, 2015 Letter from Defenders of Wildlife to Federal Defendants, at 4, 6–7 (discussing Sinervo's and Bean's research).  In light of the record before the Court, the Court finds that it is able to resolve the likelihood of Plaintiffs' success on the merits without reliance on the contested declarations, except for explanations of technical terms or complex subject matter.  *See San Luis I*, 747 F.3d at 603; *see also Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 247–48 (D.D.C. 2003) (finding no need to rely on contested expert declarations in light of "numerous documentary exhibits").  Likewise, when evaluating the merits of the 2016 BiOp the Court need not rely on the extra-record expert declaration submitted by Federal Defendants.  *See* ECF No. 40, Decl. of Michael Fris; *see also* Reply at 12 (noting that Federal Defendants "repeatedly point to their own extra-record declarations to justify and explain the basis for their analysis and conclusions").  Federal Defendants' objections to Plaintiffs' extra-record evidence are DENIED.

17

United States District Court
Northern District of California

### B. Objections to Plaintiffs' Reply Evidence

PVS moves to strike the evidence submitted by Plaintiffs in reply as improperly raising new facts and arguments. ECF No. 60. At the hearing on the instant motion, PVS indicated that two declarations offered by Plaintiffs are of particular concern: those of Kimberley Delfino, ECF No. 54, and Kathryn Kelly, ECF No. 56. The Delfino and Kelly declarations suggest that PVS may need to seek additional government permits in order to do construction work on a road and bridge leading to the project site, which would delay the construction of the project. Plaintiffs rely on the Delfino and Kelly declarations in Plaintiffs' reply brief to contend that the balance of equities and the public interest favor an injunction. *See* Reply at 15. Because the Court below does not reach the preliminary injunction factors of the balance of equities or the public interest, the Court need not consider these two declarations and DENIES PVS's motion to strike as moot.

As to the additional evidence offered by Plaintiffs in reply, the declarations of Aaron Isherwood and Jamie Rappaport Clark include fiscal and operational information for Plaintiffs relevant to the propriety of imposing a bond in the event that the Court grants injunctive relief. *See* ECF Nos. 57–58. This evidence is offered in direct response to PVS's brief in opposition to the instant motion, which argues that "Plaintiffs should be required to post a substantial bond or be required to show why such a bond cannot be secured." PVS Opp. at 10. The Court may consider such responsive evidence. *See In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 559 n.87 (C.D. Cal. 2014) (considering evidence submitted in reply when the evidence responded to evidence raised in the opposition). Similarly, an endangered species recovery plan drafted by Scott Phillips, ECF No. 55-5, is offered in response to Federal Defendants' evidence on the geographic scope of the Ciervo-Panoche Natural Area, *see* ECF No. 40, and thus may be considered by the Court.

The other evidence attached to the Rylander Declaration is all judicially noticeable or part of the administrative record. *See* ECF No. 55 (Rylander Decl.); *see also* Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."). This evidence includes three letters sent to the Corps and FWS as part of the

United States District Court
Northern District of California

consultation process; FWS's own consultation handbook; FWS's Recovery Plan for Upland Species of the San Joaquin Valley; and "5-Year Review[s]" produced by FWS on the status of the listed species.  The Recovery Plan is discussed in the 2016 BiOp, as are FWS's 5-Year Reviews of the listed species.  *See, e.g.*, 2016 BiOp App. (Literature Cited).  Indeed, the Recovery Plan is offered as an exhibit by Federal Defendants.  *See* ECF No. 40-6.  In light of the above, the Court DENIES PVS's motion to strike Plaintiffs' reply evidence.  *See Terrell v. Contra Costa Cty.*, 232 F. App'x 626, 628–29 & n.2 (9th Cir. 2007) (considering evidence offered in reply that provides "the full context" to facts discussed in the motion or opposition brief).

## IV.    DISCUSSION

Plaintiffs seek two types of preliminary injunctive relief.  First, Plaintiffs ask the Court to enjoin the Section 404 permit because, according to Plaintiffs, the Corps violated the Clean Water Act ("CWA") in issuing the Section 404 permit.  Second, Plaintiffs request an injunction setting aside the 2016 BiOp on the basis that FWS violated the Endangered Species Act ("ESA") when creating the 2016 BiOp.  In order to obtain a preliminary injunction, Plaintiffs must show "that [they] [are] likely to succeed on the merits."  *Winter*, 555 U.S. at 20.  Plaintiffs must also show that they would suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in their favor, and that an injunction is in the public interest.  *Id.*  The Court begins by examining Plaintiffs' likelihood of success on the merits of their claims.

### A. Likelihood of Success on the Merits

The Court briefly summarizes the specifics of Plaintiffs' claims.  As noted above, Plaintiffs challenge both the Corps' issuance of the Section 404 permit and FWS's creation of the 2016 BiOp.  Specifically, Plaintiffs contend that the Corps violated the CWA by (1) failing to incorporate the terms and conditions of the 2016 BiOp into the Section 404 permit, and (2) issuing the Section 404 permit in reliance upon the 2016 BiOp, which Plaintiffs argue was created in violation of the ESA.  Mot. at 19–20.  Plaintiffs' second argument against the Corps is dependent upon Plaintiffs' claims against FWS for violation of the ESA.  As to Plaintiffs' claims against FWS, Plaintiffs contend that FWS violated the ESA in two ways when creating the 2016 BiOp: (1)

1    improperly relying on conservation measures that are not certain to occur because the Corps would

2    not or could not enforce them, and (2) failing to consider the best available scientific data.  *Id.* at

3    11–18.  The Court addresses Plaintiffs' claims in turn.

### 1.    The Corps' Incorporation of the Terms and Conditions of the 2016 BiOp into the Section 404 Permit

In Plaintiffs' complaint and the opening brief of the instant motion, Plaintiffs allege that

the Corps violated the CWA because the Original Permit did not incorporate all of the terms and

conditions of the 2016 BiOp.  According to Plaintiffs, the 2016 BiOp requires the Corps to include

all of the terms and conditions of the 2016 BiOp as binding conditions in PVS's Section 404

permit.  Mot. at 1, 8.  That way, the Corps can enforce PVS's compliance with the terms and

conditions of the 2016 BiOp.  However, the Original Permit incorporates only the terms and

conditions of the 2016 BiOp related to "construction activities within the 0.121 acres of waters of

the U.S. that would be filled" as well as adjacent areas.  *See* Original Permit.  Plaintiffs contend

that this limited incorporation of the terms and conditions of the 2016 BiOp into the Original

Permit contravenes the 2016 BiOp, and fails to ensure that the project will not jeopardize the

survival and recovery of the blunt-nosed leopard lizard, San Joaquin kit fox, and giant kangaroo

rat.  Mot. at 8; *see also* Compl. ¶ 162 ("By failing to adopt and enforce the terms and conditions of

the Biological Opinion for the entire project, as required by the Service, the Corps has not ensured

against jeopardy to listed species as the CWA and its regulations require."); *id.* ¶ 8 ("Contrary to

the express conditions of the Biological Opinion, the Corps has failed to take responsibility for

implementing conservation measures beyond a tiny area of the project . . . .").

The Corps does not dispute that the Original Permit failed to incorporate all of the terms

and conditions of the 2016 BiOp.  Nor does the Corps attempt to defend this failure.  *See generally*

Fed. Opp.  Instead, in response to Plaintiffs' motion, the Corps agreed to revise the Original

Permit to require PVS's compliance with all terms and conditions of the 2016 BiOp.  *Id.* at 9–11.

The Corps filed the Revised Permit with the Court on May 17, 2016.  ECF No. 59.  Unlike the

Original Permit, the Revised Permit is expressly conditioned on PVS's compliance with "all terms

20

United States District Court
Northern District of California

and conditions in the Biological Opinion . . . to the full geographic and temporal extent . . . provided by the Biological Opinion." *See* Revised Permit at 6.  Thus, any violation of the terms and conditions of the 2016 BiOp by PVS constitutes a violation of the Revised Permit.  *See id.* The Revised Permit states that the Corps will "monitor [PVS's] implementation of the Biological Opinion over the 30 year life of the project to ensure [PVS's] compliance."  *Id.*

In response to the Corps' change in position, Plaintiffs changed their position.  In their reply brief, Plaintiffs contend that the Corps may not incorporate the terms and conditions of the 2016 BiOp into PVS's Section 404 permit.  Reply at 2.  Because the Corps only has jurisdiction over the waters of the United States, Plaintiffs contend that "it is not clear what statutory authority the Corps will assert to enforce the Biological Opinion and mitigation measures that extend for 30 years and well beyond jurisdictional waters."  *Id.*  Thus, according to Plaintiffs, the incorporation of the terms and conditions of the 2016 BiOp into the Revised Permit is arbitrary and capricious.  Plaintiffs also question the Corps' "sudden reversal" of position.  *Id.* at 3.

Plaintiffs' reply argument is entirely inconsistent with the one presented in Plaintiffs' complaint and opening brief.  Plaintiffs could have asserted at the outset that the Corps lacked jurisdiction to enforce the terms and conditions of the 2016 BiOp and thus that the Corps violated the CWA regardless of whether the Corps incorporated the 2016 BiOp into PVS's permit.  Instead, Plaintiffs argued in their complaint and opening brief that the Corps *had a duty* to incorporate the terms and conditions of the 2016 BiOp into the Original Permit yet failed to exercise this authority as required by the CWA.  As the Ninth Circuit has noted, "[i]t is well established . . . that [parties] cannot raise a new issue for the first time in their reply briefs."  *Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990) (internal quotation marks omitted); *see also Smith v. U.S. Customs & Border Prot.*, 741 F.3d 1016, 1020 n.2 (9th Cir. 2014) (declining to consider "new arguments" raised for the first time in a reply brief).  Plaintiffs' argument about the Corps' purported lack of jurisdiction to enforce the 2016 BiOp was raised for the first time in Plaintiffs' reply brief.  Thus, pursuant to *Eberle*, the Court can not consider this argument.  *See Eberle*, 901 F.2d at 818; *see also Cal. Native Plant Soc. v. U.S. Envtl. Prot. Agency*, 2006 WL 3289203, at *10–11 (N.D. Cal.

Case No. 16-CV-01993-LHK
ORDER DENYING MOTION FOR A PRELIMINARY INJUNCTION

United States District Court
Northern District of California

1  Nov. 3, 2006) (finding plaintiffs are not likely to succeed on claims that are not properly raised in

2  the complaint).

3  Moreover, with the Revised Permit, Plaintiffs received exactly what their motion and

4  complaint appeared to request: the Corps' "incorporati[on] [of] *all* of the mitigation measures

5  specified in the Biological Opinion as binding conditions of any 404 permit." Mot. at 8, 19

6  (contending that the 2016 BiOp "specifically requires that the Corps include these [conservation]

7  measures as binding, enforceable conditions in its Section 404 permit for the project and ensure

8  the developer's compliance for the life of the project"); *see also* Compl. ¶¶ 8, 162. Contrary to the

9  concerns expressed in Plaintiffs' complaint and motion, it is now clear that "the Corps intends to

10  utilize its authorities to fully implement and enforce the BiOp's terms and conditions." Mot. at 11

11  (arguing that "serious questions" exist about the Corps' intentions). In other words, the Corps has

12  agreed to do what Plaintiffs' complaint and motion argued was required by the CWA, which is to

13  require in the Section 404 permit the implementation of all of the terms and conditions of the 2016

14  BiOp.

15  Even if the Court were to consider the arguments first raised in Plaintiffs' reply, the Court

16  finds that Plaintiffs are not likely to succeed in showing that the Corps violated the CWA by

17  incorporating all of the terms and conditions of the 2016 BiOp into the Revised Permit. Plaintiffs

18  raise the following four arguments, which all relate to the Corps' enforcement of the terms and

19  conditions of the 2016 BiOp through the Revised Permit. First, Plaintiffs argue that the Corps

20  lacks jurisdiction to enforce the terms and conditions of the 2016 BiOp through the Revised

21  Permit. Reply at 2–5. Second, Plaintiffs contend that the Revised Permit expires in five years,

22  after which the Corps will lack jurisdiction to enforce the terms and conditions of the 2016 BiOp.

23  *See id.* at 5. Third, Plaintiffs question how the Corps will enforce the terms and conditions of the

24  2016 BiOp as incorporated into the Revised Permit. *See id.* at 2–5. Lastly, Plaintiffs express

25  concern that the Corps will refuse to enforce the Revised Permit and will deny jurisdiction in any

26  future litigation brought by Plaintiffs. *See, e.g.*, May 20 Tr. at 34. The Court addresses each in

27  turn.

28

Case No. 16-CV-01993-LHK
ORDER DENYING MOTION FOR A PRELIMINARY INJUNCTION

1    As to Plaintiffs' first argument, Plaintiffs claim that the Corps' jurisdiction is limited to the

2    small area of the project that constitutes waters of the United States and thus it "not clear what

3    statutory authority the Corps will assert to enforce the Biological Opinion and mitigation

4    measures" beyond jurisdictional waters.  Reply at 2.  Accordingly, Plaintiffs argue that the

5    incorporation of all of the terms and conditions of the 2016 BiOp into the Revised Permit,

6    including terms and conditions with impacts beyond jurisdictional waters, is arbitrary and

7    capricious.  Plaintiffs do not cite nor interpret the regulations governing the scope of the Corps'

8    jurisdiction.  Instead, Plaintiffs point to the Corps' own statements that the Corps' jurisdiction is

9    limited to waters of the United States.  *See id.* at 2–3.

10    Plaintiffs are correct that the Corps' jurisdiction to issue Section 404 permits is defined by

11    the discharge of material into waters of the United States.  *See* 33 U.S.C. §§ 1311, 1344; Fed. Opp.

12    at 10.  However, as Plaintiffs acknowledged at the hearing, the Corps' regulations give the Corps

13    some authority to impose conditions on Section 404 permits that are not strictly limited to

14    jurisdictional waters.  *See* May 20 Tr. at 5–6 (acknowledging that the regulations provide "some

15    latitude" to the Corps).  Specifically, the Corps may add special conditions to Section 404 permits

16    when necessary to satisfy legal requirements, including, as relevant here, "compliance with the

17    404(b)(1) guidelines."  33 C.F.R. § 325.4 (noting that permit conditions must be "directly related

18    to the impacts of the proposal, appropriate to the scope and degree of those impacts, and

19    reasonably enforceable").

20    Moreover, in the consultation and this litigation, the Corps has distinguished between its

21    jurisdiction and its permitting authority.  *See, e.g.*, ECF No. 24-3 (noting that the "permit area" is

22    different from "jurisdiction" or "discretional authority"); Fed. Supp. Br. at 1 ("[T]he Corps retains

23    discretion to assert control and supervision beyond its specific authority over discharges of

24    dredged or fill material into jurisdictional waters."); *cf.* Compl. ¶ 98 (noting that the Corps'

25    "earlier statement to the Service" provided that the "'project area' and not its specific jurisdiction

26    should be the focus of the species consultation").  While the Corps has not been particularly clear

27    about the distinction between its jurisdiction and its permitting authority, the Ninth Circuit has

28

23

recognized that the Corps' permitting authority may extend to areas beyond United States' waters in some circumstances, for example when those waters can not be segregated from the rest of a project.  *See Save Our Sonoran*, 408 F.3d at 1123 (finding that the Corps' permitting authority extended to an entire development although only 5% of the development consisted of jurisdictional wetlands); *White Tanks Concerned Citizens, Inc. v. Strock*, 563 F.3d 1033, 1040 (9th Cir. 2009) ("[W]here a development could not go forward without a permit, then the Federal involvement was sufficient to grant 'Federal control and responsibility' over the project . . . .").

Here, the Corps contends that it conditioned the Revised Permit on PVS's compliance with the terms and conditions of the 2016 BiOp in accordance with its regulations and permitting authority.  The Court notes that the project's impact on jurisdictional waters is incredibly small— only 0.121 acres of United States' waters will be affected, out of over 2,000 acres of project site and 25,000 acres of conservation lands.  However, it is "not the quantity of the water that matters, but the fact that the waters will be affected, and further, whether the waters must be affected to fulfill the project's goals."  *White Tanks Concerned Citizens, Inc.*, 563 F.3d at 1040.  The Corps has consistently represented that the entirety of the project can not proceed but for the impacts to the Corps' jurisdictional waters.  ECF No. 24-3 (Aug. 21, 2015 Letter from FWS to the Corps) (discussing Corps' representations); ECF No. 43-6 (Aug. 28, 2015 Letter from the Corps to FWS) (finding that "construction of the entire project is interrelated to the Corps' statutory authority under Section 404 of the Clean Water Act"); May 20 Tr. at 26–27 (asserting that the stream crossings requiring dredge and fill "were essential to the viability of the project" and "the project couldn't have proceeded without that permit because those roads were essential").  Plaintiffs bear the burden of demonstrating that they are likely to succeed in showing that the Corps exceeded its permitting authority, *see Winter*, 555 U.S. at 22, and this Court owes deference to the Corps, *see San Luis II*, 776 F.3d at 994 ("The arbitrary or capricious standard is a deferential standard of review under which the agency's action carries a presumption of regularity.").  Yet Plaintiffs do not analyze any case law related to the Corps' permitting authority nor examine the regulations governing the Corps' jurisdiction.  *Cf.* Reply at 2 (noting "it is not clear what statutory authority

24

1    the Corps will assert").  By failing to do so, Plaintiffs fail to show a likelihood of success on the

2    merits of Plaintiffs' claim that the Corps lacks permitting authority in this case.

3         Next, Plaintiffs question how the Corps could enforce any permit conditions against PVS

4    after the expiration of the Revised Permit in five years.  *See id.* at 5; May 20 Tr. at 20.  To

5    demonstrate that the Revised Permit expires in five years, Plaintiffs point to general condition 1 of

6    the Revised Permit, which provides that PVS must complete the work authorized by the permit by

7    March 15, 2021.  *See* Reply at 5; Pl. Supp. Br. at 1; *see also* Revised Permit at 2.  The Corps

8    represents, however, that the Revised Permit does not expire.  The Corps explains that "General

9    Condition 1 does not define the temporal limit of the Corps' permit, but rather sets a deadline of

10   March 15, 2021 for PVS to complete its dredge and fill discharges. . . . The terms and conditions

11   of the Permit remain in effect and enforceable after the fill work is completed."  Fed. Supp. Br. at

12   1; *see also* May 20 Tr. at 42 (noting that "the permit conditions do not expire with the five-year

13   time period to do the discharges into the waters" and the permit "is valid, remains valid even after

14   the discharges are completed because the special conditions carry forward").  The Corps points the

15   Court to other sections of the Revised Permit that extend beyond five years.  May 20 Tr. at 42.

16   For example, the Revised Permit provides that PVS must conduct certain monitoring and reporting

17   for ten years and that PVS must maintain "in perpetuity" a 205.9 preserve of United States'

18   waters.  *See* Revised Permit at 3–4.  Plaintiffs do not challenge the Corps' authority to impose

19   these permit conditions.  In addition, the Revised Permit states that the Corps and FWS "will

20   monitor [PVS's] implementation of the Biological Opinion over the 30 year life of the project to

21   ensure [PVS's] compliance with the terms and conditions therein."  *Id.* at 6–7.  Plaintiffs point to

22   no authority contradicting the Corps' representations about the non-expiration of the Revised

23   Permit.  Thus, Plaintiffs fail to establish a likelihood of success on their claim that the Corps lacks

24   authority to enforce the permit conditions after five years.

25        Third, Plaintiffs appear to challenge how the Corps will be able to enforce the terms and

26   conditions of the 2016 BiOp as incorporated in the Revised Permit.  *See* Reply at 4–5.  However,

27   the Revised Permit itself provides mechanisms for enforcement.  Specifically, the Revised Permit

28
     25

United States District Court
Northern District of California

United States District Court
Northern District of California

1    provides that the Corps "may reevaluate its decision on this permit at any time the circumstances

2    warrant," including if PVS fails to comply with the conditions of the permit.  Revised Permit at 9.

3    Reevaluation of PVS's permit may result in suspension, modification, or revocation of the permit,

4    or criminal or civil enforcement by the U.S. Attorney's Office.  *Id.* at 10; *see also* 33 C.F.R.

5    § 326.5 (noting that enforcement actions may seek penalties, compliance with orders of the district

6    engineer, or other appropriate relief).

7            In addition, the ESA provides mechanisms to enforce the terms and conditions of the 2016

8    BiOp.  For example, failure by PVS to follow through on conservation measures proposed as part

9    of the project requires the Corps to reinitiate consultation with FWS.  *BLM*, 698 F.3d at 1115

10   (citing 50 C.F.R. § 402.16(c)).  If the Corps fails to comply with its duty to reinitiate consultation,

11   then the 2016 BiOp and incidental take statement become invalid, and the Corps and PVS are no

12   longer insulated from Section 9's prohibition against take.  *See id.*  The Corps and PVS could then

13   be subject to enforcement actions by FWS or by citizen suits.  *See id* (citing 16 U.S.C.

14   § 1540(g)(1)(A)).  Thus, the Corps has the means, and the duty, to enforce PVS's compliance with

15   the terms and conditions of the 2016 BiOp as incorporated into the Revised Permit.

16           Lastly, at the hearing Plaintiffs voiced concern that the Corps may deny jurisdiction in any

17   future litigation brought by Plaintiffs to ensure that the Corps enforces PVS's compliance with the

18   terms and conditions of the 2016 BiOp.  *See, e.g.*, May 20 Tr. at 34.  The Court understands

19   Plaintiffs' frustration.  The Corps has altered its position multiple times during the consultation

20   and litigation processes.  Although the Court agrees with Defendants that some of this change

21   reflects "the agencies working together to deal with the tension between" various environmental

22   statutes, the Court also agrees with Plaintiffs that the circumstances do not provide "a great deal of

23   confidence" in the Corps' commitment to enforcing the terms and conditions of the 2016 BiOp.

24   *See id.* at 7, 23.

25           However, a future denial of the Corps' jurisdiction would contradict the position taken by

26   Defendants in the instant litigation.  "[W]here a party assumes a certain position in a legal

27   proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his

28

Case No. 16-CV-01993-LHK
ORDER DENYING MOTION FOR A PRELIMINARY INJUNCTION

1    interests have changed, assume a contrary position . . . ." *Baughman v. Walt Disney World Co.*,

2    685 F.3d 1131, 1133 (9th Cir. 2012) (ellipsis in original).  Plaintiffs may yet succeed on the merits

3    in this litigation.  If they do not, however, Defendants will not be permitted to deny the Corps'

4    authority over the full geographic scope and duration of the project that Defendants have asserted

5    in this litigation.  *See id*; *cf. Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1357–

6    58 (9th Cir. 1994) ("Having persuaded the district court that it understands its duty to follow

7    NEPA in reviewing future site-specific programs, judicial estoppel will preclude the [Forest]

8    Service from later arguing that it has no further duty to consider the cumulative impact of site

9    specific programs.").

10          In sum, the Court finds that Plaintiffs do not establish a likelihood of success on the merits

11    of their claim that the Corps violated the CWA by arbitrarily and capriciously incorporating the

12    terms and conditions of the 2016 BiOp into PVS's Revised Permit.  Simply put, the Revised

13    Permit remedies the defects of the Original Permit identified by Plaintiffs in the complaint and in

14    the instant motion.  In addition, Plaintiffs do not show that the Corps lacks jurisdiction to

15    incorporate the terms and conditions of the 2016 BiOp into the Revised Permit and to enforce

16    those terms and conditions in the future.

17          Next, Plaintiffs contend that FWS's creation of the 2016 BiOp violated the ESA by (1)

18    improperly relying on conservation measures that are not certain to occur because the Corps would

19    not or could not enforce them, and (2) failing to consider the best available scientific data.

20    Plaintiffs also contend that, if FWS violated the ESA in either of these two ways when creating the

21    2016 BiOp, then the Corps improperly relied upon the 2016 BiOp to satisfy the Corps' obligations

22    under the CWA and associated regulations.  Mot. at 19–20.  As discussed in the factual and

23    regulatory background, the Corps relied upon the 2016 BiOp, and specifically the 2016 BiOp's

24    conclusion that the proposed project was unlikely to jeopardize the survival and recovery of the

25    listed species, when deciding to issue a Section 404 permit to PVS under the CWA.  If the 2016

26    BiOp was created in violation of the ESA, Plaintiffs argue, then the Corps' reliance upon the 2016

27    BiOp to issue the Section 404 permit violated the CWA.  The Court first addresses FWS's

28

United States District Court
Northern District of California

27

1   consideration of the consideration measures, then FWS's use of best available scientific data.

2       **2. FWS's Consideration of Conservation Measures**

3       As stated above, Plaintiffs assert two claims based on FWS's consideration of conservation

4   measures in the 2016 BiOp.  First, Plaintiffs contend that FWS violated the ESA by considering in

5   the 2016 BiOp conservation measures that are not certain to occur.  Mot. at 11–13.  Second,

6   Plaintiffs contend that, if FWS violated the ESA when creating the 2016 BiOp, then the Corps

7   violated the CWA by relying upon the 2016 BiOp to issue PVS's Section 404 permit.  *Id.* at 19–

8   20.  The Court considers whether FWS violated the ESA, and then, based on that conclusion,

9   addresses whether the Corps violated the CWA.

10      Under Ninth Circuit law, FWS may, consistent with the ESA, rely on conservation

11  measures in drafting a biological opinion.  Such measures, however, must be "reasonably specific,

12  certain to occur, and capable of implementation; they must be subject to deadlines or otherwise-

13  enforceable obligations; and most important, they must address the threats to the species in a way

14  that satisfies the jeopardy and adverse modification standards."  *Ctr. for Biological Diversity v.*

15  *Rumsfeld*, 198 F. Supp. 2d 1139, 1152 (D. Ariz. 2002) (citing *Sierra Club v. Marsh*, 816 F.2d

16  1376 (9th Cir. 1987)); *see also Ctr. for Biological Diversity v. Salazar*, 804 F. Supp. 2d 987,

17  1001–04 (D. Ariz. 2011) (finding that FWS improperly relied on conservation measures that were

18  conceptual in nature, not fully funded, and not reasonably specific).  Measures are "certain to

19  occur" when they involve "specific and binding plans" or "a clear, definite commitment of

20  resources for future improvements."  *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*

21  *("NWF")*, 524 F.3d 917, 935–36 (9th Cir. 2008) (finding agency's "sincere general commitment

22  to future improvements" inadequate to support the biological opinion's conclusions).  Reliance on

23  conservation measures that do not meet these standards is arbitrary and capricious in violation of

24  the ESA.  *See id.*; *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 254 F. Supp. 2d 1196,

25  1213–14 (D. Or. 2003) (finding that the "absence in the record of any binding commitments" and

26  "lack of certainty" as to the implementation of conservation measures rendered reliance on those

27  conservation measures arbitrary and capricious).

28

28

United States District Court
Northern District of California

United States District Court
Northern District of California

When creating the 2016 BiOp, FWS analyzed a variety of conservation measures, including, for example, the purchase of over 25,000 acres of conservation lands; the relocation of giant kangaroo rats from the project site; and the education of project site personnel to recognize and protect listed species. *See* 2016 BiOp at 22–34 (describing the proposed conservation measures). In the instant motion, Plaintiffs do not dispute that these conservation measures are sufficiently specific, capable of implementation, and have deadlines or objective criteria by which to measure implementation. *See generally* Mot. at 12–13. Instead, Plaintiffs argue that the conservation measures that FWS discussed in the 2016 BiOp do not meet Ninth Circuit standards because the measures are not "certain to occur." *Id.* at 13. According to Plaintiffs, if the Corps would not or could not enforce the conservation measures by including the terms and conditions of the 2016 BiOp as binding conditions in PVS's permit, then the measures were unenforceable and thus not "certain to occur." *Id.* at 12–13; Reply at 2–5. Thus, Plaintiffs argue that FWS knew or should have known when drafting the 2016 BiOp that (1) the Corps would refuse to enforce the conservation measures through binding conditions in PVS's permit, or (2) that the Corps lacked jurisdiction to enforce the measures through binding conditions in PVS's permit. The Court addresses these two arguments respectively.

As a preliminary matter, the Court notes that both parties agree that whether the Corps ultimately incorporated the conservation measures and the other terms and conditions of the 2016 BiOp into the Original or Revised Permit does not dictate whether FWS violated the ESA when creating the 2016 BiOp. *See* Pl. Supp. Br. at 3; Fed. Supp. Br. at 3. The U.S. Supreme Court has held that an action agency such as the Corps "is technically free to disregard the Biological Opinion and proceed with its proposed action." *Bennett*, 520 U.S. at 170; *see also* 50 C.F.R. § 402.15(a) ("Following the issuance of a biological opinion, the Federal agency shall determine whether and in what manner to proceed with the action in light of its section 7 obligations and the Service's biological opinion."). Thus, the Court does not look to the Corps' incorporation (or lack thereof) of the 2016 BiOp into PVS's Section 404 permit to determine whether FWS acted arbitrarily and capriciously in violation of the ESA. Rather, the Court analyzes what FWS knew

29

or should have known at the time that FWS drafted the 2016 BiOp.

As to Plaintiffs' first argument, Plaintiffs contend that the Corps has long represented that the Corps would not incorporate all of the terms and conditions of FWS's biological opinion into PVS's Section 404 permit because the Corps had limited jurisdiction over the project. Mot. at 12. To support this argument, Plaintiffs point to a letter sent by FWS to the Corps on August 21, 2015. *See* ECF No. 24-3. In the August 21, 2015 letter, FWS noted that the Corps had asserted jurisdiction only over the project's construction, not the project's operation, maintenance, or decommissioning. *See id.* at 3. FWS's letter noted confusion over the scope of the Corps' authority compared to the scope of the biological opinion, and the enforceability of the terms and conditions of the biological opinion. *Id.* FWS asked the Corps to define its jurisdiction and to state whether the Corps would include the terms and conditions of the biological opinion in PVS's Section 404 permit. *Id.* at 2–3; *see also* Draft BiOp at 3–4 (explaining discrepancy between Corps' stated jurisdiction and the scope of the biological opinion). In light of the August 21, 2015 letter, Plaintiffs argue that FWS should have known before drafting the 2016 BiOp that the Corps would refuse to enforce all of the terms and conditions discussed in FWS's biological opinion, including terms and conditions related to the conservation measures that impact phases of the project following construction. Mot. at 12–13 (arguing that the Corps "has long said it would *not* accept responsibility for any phases of the project beyond construction").

Plaintiffs' argument is not well founded. Plaintiffs fail to acknowledge that the Corps responded to FWS's August 21, 2015 letter with specific representations that the Corps *would* enforce the terms and conditions of FWS's biological opinion. *See* ECF No. 43-6. On August 28, 2015, the Corps sent FWS a letter stating: "The Corps will include a special condition in any permit, if issued, requiring the applicant to adhere to the [Biological Opinion]." *Id.* (acknowledging that "the [terms and conditions of the incidental take statement in the biological opinion] are non-discretionary and would become binding on the applicant for the life of the project through a permit issued by this office"); *id.* ("The [Biological Opinion] is enforceable through a special condition under any permit issued to the applicant."); *id.* (acknowledging the

1   Corps' duty to reinitiate consultation with FWS).  Although the Corps confirmed that its

2   jurisdiction was limited, the Corps also advised FWS to consider the impact of the entire proposed

3   solar project, for the life of the project.  *Id.*  Thus, while the Corps may initially have asserted

4   limited authority over the project, in the August 28, 2015 letter the Corps confirmed a project-

5   wide scope and represented that the Corps would enforce any terms and conditions of the 2016

6   BiOp through binding conditions in PVS's Section 404 permit.  Plaintiffs point to no other

7   representations by the Corps before FWS drafted the 2016 BiOp that would call the Corps' August

8   28, 2015 letter into question.  Consequently, the Court can not conclude that the Corps' statements

9   demonstrate that FWS should have known that the Corps would not enforce the terms and

10  conditions of the 2016 BiOp, including the implementation of the conservation measures.

11          Plaintiffs' reliance on the Corps' own statements is further undermined by the Corps'

12  inclusion of the conservation measures as part of the Corps' NEPA analysis and project

13  description.  Specifically, after the Corps' August 28, 2015 letter, the Corps altered the scope of its

14  environmental impact analysis under NEPA to be consistent with the Corps' authority over the

15  entire project and conservation measures.  Under NEPA, the Corps needed to analyze the impact

16  that the proposed project would have on jurisdictional waters as well as on "those portions of the

17  entire project over which the district engineer has sufficient control and responsibility to warrant

18  Federal review."  33 C.F.R. 325, App. B § 7(b)(1).  Here, the Corps' December 2015 final

19  environmental impact statement under NEPA analyzed the entire project for the life of the

20  project—including the conservation measures.  *See* 2016 BiOp at 4 (explaining that the Corps'

21  final environmental impact statement "included the entire 2,154-acre project area and the

22  compensatory mitigation activities"); *see also* Pl. Supp. Br. at 1 (noting that the project described

23  as "the preferred alternative" in the final environmental impact statement includes the project site

24  and the conservation and mitigation measures).  FWS looked to the scope of the Corps' final

25  analysis under NEPA in order to determine the scope of the 2016 BiOp.  *See* 2016 BiOp at 4–5.

26  The NEPA analysis' inclusion of the conservation measures supports FWS's consideration of the

27  conservation measures when drafting the 2016 BiOp.

28

31

United States District Court
Northern District of California

1     Moreover, the Corps confirmed in the January 20, 2016 project description submitted to

2 FWS that the conservation measures are part of the proposed project.  In order to initiate

3 consultation with FWS, the Corps had to provide FWS with a "description of the action to be

4 considered" and a "description of the specific area that may be affected by the action."  50 C.F.R.

5 § 402.14(c).  "Describing the proposed action also includes any conservation measures proposed

6 as part of the action."  ECF No. 55-6, U.S. Fish & Wildlife Serv. & Nat'l Marine Fisheries Serv.,

7 *Endangered Species Consultation Handbook: Procedures for Conducting Consultation and*

8 *Conference Activities under Section 7 of the Endangered Species Act* 4-19 (1998) [hereinafter *ESA*

9 *Handbook*]; *see also, e.g., BLM*, 698 F.3d at 1113 (finding *ESA Handbook* informative).  Here, the

10 Corps included the conservation measures in the project description submitted to FWS on January

11 20, 2016.  *See* ECF No. 40-1, Corps' Request for Reinitiation of Formal Consultation.

12     The Ninth Circuit has indicated that conservation measures included in a proposed project

13 are likely enforceable under the ESA.  *BLM*, 698 F.3d at 1114 ("[S]ince conservation measures are

14 part of the proposed action, their implementation is required under the terms of the consultation.");

15 *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv. ("CBD")*, 807 F.3d 1031, 1046 n.12

16 (9th Cir. 2015) (noting "language in *BLM* indicating that, had the conservation measures in that

17 case simply been included as part of the proposed action and biological opinion, they likely would

18 have been enforceable"); *see also NWF*, 524 F.3d at 935–36 (noting that conservation measures

19 are certain to occur when based on "specific and binding plans").  Accordingly, like the Corps'

20 analysis under NEPA, the Corps' inclusion of the conservation measures in the proposed project

21 supports FWS's consideration of the measures as part of the Corps' project.

22     In sum, when drafting the 2016 BiOp, FWS knew that (1) although the Corps had initially

23 asserted limited authority over the project, the Corps later asked FWS to do a project-wide

24 analysis and promised to "include a special condition in any permit, if issued, requiring the

25 applicant to adhere to the [Biological Opinion]," ECF No. 43-6; (2) the Corps included the

26 conservation measures in the Corps' own analysis of the environmental impact of the project

27 under NEPA; and (3) the Corps' description of the proposed project was consistent with the

28

Case No. 16-CV-01993-LHK
ORDER DENYING MOTION FOR A PRELIMINARY INJUNCTION

United States District Court
Northern District of California

Corps' enforcement of the conservation measures.  Thus, far from being faced with proposed

conservation measures that were "conceptual in nature only"; measures that could be "altered,

replaced, or abandoned"; or mere "plans" to be prepared in the future; here FWS had multiple

indications that the Corps considered the conservation measures to be part of the proposed project

and that the Corps would enforce the measures through binding conditions in PVS's permit.  *See*

*Salazar*, 804 F. Supp. 2d at 1002 (rejecting FWS's reliance on "uncertain and contingent

mitigation measures"); *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*,

99 F. Supp. 3d 1033, 1053–56 (N.D. Cal. Apr. 3, 2015) (finding that conservation measures were

not certain to occur when the measures lack specific obligations).  Accordingly, the Court rejects

Plaintiffs' contention that the Corps' statements to FWS demonstrate that the conservation

measures were not certain to occur.

However, the Court agrees with Plaintiffs that it is difficult to understand why the Corps

did not make all of the terms and conditions of the 2016 BiOp, including the conservation

measures, "enforceable through a special condition" under PVS's Original Permit.  Instead, the

Original Permit only required PVS's compliance with terms and conditions "limited to

construction activities within the 0.121 acres of waters of the U.S. that would be filled" and

adjacent areas.  *See* Original Permit at 7.  When questioned at the hearing on the instant motion,

the Corps still lacked a satisfactory answer as to why the Corps did not incorporate the 2016 BiOp

into the Original Permit.  *See* May 20 Tr. at 23–25.  Accordingly, the Court understands Plaintiffs'

frustration with these consultation and permitting processes.  However, as discussed above, that

the Original Permit was contrary to the Corps' representations does not dictate whether *FWS* acted

arbitrarily and capriciously in light of what FWS knew when drafting the 2016 BiOp.  *See* Pl.

Supp. Br. at 3; Fed. Supp. Br. at 3.  Moreover, the Corps ultimately revised the permit to be

consistent with the Corps' representations to FWS, the scope of the Corps' NEPA analysis, and

the Corps' proposed project description to FWS.

The Court turns to Plaintiffs' second argument as to whether the conservation measures are

"certain to occur."  Plaintiffs contend that the Corps lacks jurisdiction over the entire proposed

Case No. 16-CV-01993-LHK
ORDER DENYING MOTION FOR A PRELIMINARY INJUNCTION

1 │ project and thus FWS should have known that the Corps could not incorporate all of the terms and

2 │ conditions of the 2016 BiOp into PVS's Section 404 permit.  Reply at 2–5.

3 │         The Court is not persuaded.  First, as discussed above, Plaintiffs do not establish a

4 │ likelihood of success on the claim that the Corps lacks jurisdiction to condition PVS's permit on

5 │ PVS's compliance with all of the terms and conditions of the 2016 BiOp, including those terms

6 │ and conditions that impact areas beyond jurisdictional waters.  *See supra* Section IV.A.1.

7 │ Plaintiffs point to no additional evidence or knowledge on the part of FWS, besides the Corps'

8 │ statements addressed above, that would indicate that FWS believed when drafting the 2016 BiOp

9 │ that the Corps lacks jurisdiction over the conservation measures proposed as part of the project.

10 │        Second, Plaintiffs point to no authority finding that FWS acted arbitrarily and capriciously

11 │ by relying on the Corps' description of the Corps' own proposed project.  FWS's internal

12 │ handbook instructs FWS on how to evaluate the Corps' proposed project, to which the handbook

13 │ refers as the Corps' "action."  Specifically, according to the *ESA Handbook*, FWS should "verify

14 │ the scope of the proposed action, which includes identifying the area likely to be affected directly

15 │ and indirectly by the proposed action, and cumulative effects."  *ESA Handbook* at 4-6.

16 │ Additionally, FWS has the authority to define the area "to be affected directly or indirectly by the

17 │ Federal action."  50 C.F.R. § 402.02; *ESA Handbook* at 4-15 (noting FWS is responsible for the

18 │ "biological determination" of "impacts to the species/habitat").  Even so, "[FWS] can evaluate

19 │ *only the Federal action proposed*, not the action as [FWS] would like to see that action modified."

20 │ *ESA Handbook* at 4-33 (emphasis added).  Here, FWS reached out to the Corps for confirmation

21 │ of the scope of the Corps' action.  ECF No. 24-3.  In the Corps' August 28, 2015 response, the

22 │ Corps assured FWS that the Corps would enforce a biological opinion premised on the entire

23 │ project, which includes the conservation measures.  ECF No. 43-6.  On January 20, 2016, the

24 │ Corps asked FWS for consultation based on the entire project, including the conservation

25 │ measures.  ECF No. 40-1.  Plaintiffs cite no authority that FWS needed to do more to question the

26 │ scope of the Corps' jurisdiction.

27 │        In light of the foregoing, Plaintiffs fail to show that FWS should have known that the

28 │

34

United States District Court
Northern District of California

United States District Court
Northern District of California

1    conservation measures were not certain to occur because the Corps either would not or could not

2    enforce the conservation measures through binding conditions in PVS's Section 404 permit.

3    Consequently, Plaintiffs fail to establish a likelihood of success on the merits of Plaintiffs' claim

4    that FWS's consideration of the conservation measures in the 2016 BiOp was arbitrary and

5    capricious in violation of the ESA.  Because Plaintiffs are not likely to succeed on the merits of

6    Plaintiffs' claim that FWS's consideration of the conservation measures in the 2016 BiOp violated

7    the ESA, Plaintiffs are not likely to succeed on the merits of Plaintiffs' derivative claim that the

8    Corps violated the CWA by relying on the 2016 BiOp.

9        **3.  FWS's Use of Best Available Scientific Data**

10       Plaintiffs next argue that FWS violated the ESA because FWS failed to use the best

11   available scientific data when drafting the 2016 BiOp.  Mot. at 13–18.  In addition, as above,

12   Plaintiffs contend that, if FWS violated the ESA when drafting the 2016 BiOp, then the Corps

13   violated the CWA by relying upon the 2016 BiOp to issue PVS's Section 404 permit.  *Id.* at 19–

14   20.  The Court first considers whether FWS violated the ESA by failing to use the best available

15   scientific data, and then, based on that conclusion, addresses whether the Corps violated the CWA.

16       The ESA requires FWS to use the "best scientific and commercial data available" when

17   formulating a biological opinion.  50 C.F.R. § 402.14(g)(8); 16 U.S.C. § 1536(a)(2).  The

18   determination of what constitutes the "*best* scientific data available" belongs to FWS's "special

19   expertise. . . . When examining this kind of scientific determination, as opposed to simple findings

20   of fact, a reviewing court must generally be at its most deferential."  *San Luis I*, 747 F.3d at 602

21   (ellipsis in original) (quoting *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103

22   (1983)).  "Absent superior data[,] occasional imperfections do not violate the ESA best available

23   standard."  *Id.* (internal quotation marks omitted).  "The best *available* data requirement merely

24   prohibits an agency from disregarding available scientific evidence that is in some way better than

25   the evidence it relies on."  *Id.* (brackets and internal quotation marks omitted).  "An agency

26   complies with the best available science standard so long as it does not ignore available studies,

27   even if it disagrees with or discredits them."  *CBD*, 807 F.3d at 1048; *see also San Luis I*, 747 F.3d

28                                                      35

1  at 602 ("Essentially, FWS cannot ignore available biological information." (internal quotation

2  marks omitted)).

3  In the instant motion, Plaintiffs argue that FWS rejected, without justification, what

4  Plaintiffs consider to be the "best available" scientific data and instead relied on subpar data.

5  Plaintiffs challenge six specific decisions in the 2016 BiOp: (1) the determination of the genetic

6  uniqueness of the blunt-nosed leopard lizard; (2) the determination of the distribution of the blunt-

7  nosed leopard lizard; (3) the determination of the population of the giant kangaroo rat; (4) the

8  analysis of the impact of drought on the giant kangaroo rat; (5) the analysis of the impact on the

9  San Joaquin kit fox of relocating giant kangaroo rats from the project site; and (6) the analysis of

10  the impact of habitat loss on the giant kangaroo rat and San Joaquin kit fox.  Mot. at 13–18.  The

11  Court addresses these six decisions respectively.

12  **a.  Genetic Uniqueness of the Blunt-Nosed Leopard Lizard**

13  Plaintiffs first assert that FWS improperly rejected a preliminary study of blunt-nosed

14  leopard lizard genetics conducted by the United States Geographical Survey ("USGS") in favor of

15  a peer reviewed study by Grimes (2014).  According to Plaintiffs, Grimes (2014) is inferior to the

16  USGS study because Grimes (2014) analyzes fewer lizards and "cannot speak to the USGS

17  evidence that the population of lizards at the project site may be a different genetic entity from the

18  population in Silver Creek Ranch."  Reply at 8; *see also* Mot. at 14–15.  Silver Creek Ranch is one

19  of the three proposed conservation lands in the Panoche Valley, in addition to the Valley Floor

20  Conservation Lands ("Valley Floor") and the Valadeao Ranch Conservation Lands ("Valadeao

21  Ranch").  2016 BiOp at 32, 34, 97–98.  These three sites represent over 24,000 acres of

22  conservation lands that are contiguous with or near to the project site, which is also in the Panoche

23  Valley.  According to Plaintiffs, the USGS study suggests that the blunt-nosed leopard lizards on

24  the project site may be genetically unique from those on the conservation lands.  Thus, Plaintiffs

25  argue, the USGS data provides stronger support than Grimes (2014) for the protection of as much

26  of the population on the project site as possible.  Reply at 9.

27  Plaintiffs fail to establish a likelihood of success on the merits of this claim.  FWS

28
Case No. 16-CV-01993-LHK
ORDER DENYING MOTION FOR A PRELIMINARY INJUNCTION

United States District Court
Northern District of California

United States District Court
Northern District of California

considered the USGS study but chose not to rely on it because the USGS study has only "preliminary results" and "has not been subject to peer review and is not considered as [the] best scientific information available." 2016 BiOp at 89 n.10. Instead, in the 2016 BiOp, FWS relied on Grimes (2014), which examined less genetic data than the USGS study but was published and peer reviewed.[3] Courts have recognized that the peer review process, while not necessary, "clearly is designed to ensure the accuracy and reliability of scientific information relied on by agencies." *Grand Canyon Tr. v. U.S. Bureau of Reclamation*, 2010 WL 2643537, at *17 (D. Ariz. June 29, 2010). Given that the determination of what constitutes the "*best* scientific data available" belongs to FWS's "special expertise," *San Luis I*, 747 F.3d at 602, Plaintiffs fail to show a likelihood of success on their claim that FWS violated the ESA by arbitrarily and capriciously choosing to rely on Grimes (2014), which was peer reviewed, rather than the more extensive but "preliminary" USGS study. *See Conservation Cong. v. Finley*, 774 F.3d 611, 620 (9th Cir. 2014) ("Under our deferential standard of review, we are not permitted to substitute our judgment for the agency's in determining which scientific data to credit, so long as the conclusion is supported by adequate and reliable data."). Accordingly, FWS did not improperly "ignore available biological information." *San Luis I*, 747 F.3d at 602.

### b.  Distribution of the Blunt-Nosed Leopard Lizard

Plaintiffs challenge FWS's determination of the distribution of blunt-nosed leopard lizards in the vicinity of the project. Knowing the distribution of blunt-nosed leopard lizards in the vicinity of the project is important to evaluating how many blunt-nosed leopard lizards will be impacted by the project, as well as the benefit provided by the conservation lands. *See* 2016 BiOp at 61–64, 85–91. Plaintiffs assert that FWS's analysis of this issue arbitrarily rejected models by

---

[3] FWS, in the 2016 BiOp, did not compare the genetics of the blunt-nosed leopard lizards on the project site with those on the conservation lands. However, relying on Grimes (2014), FWS recognized the genetic uniqueness of the blunt-nosed leopard lizards in the Panoche Valley area, which includes the project site and the conservation lands. FWS found that the conservation measures in the 2016 BiOp would allow this unique local population to persist in the Panoche Valley. Specifically, FWS, in the 2016 BiOp, found that the connection of the project site with the conservation lands would protect the Panoche Valley population from fragmentation and isolation. 2016 BiOp at 89.

Case No. 16-CV-01993-LHK
ORDER DENYING MOTION FOR A PRELIMINARY INJUNCTION

United States District Court
Northern District of California

Sinervo, a recognized expert on blunt-nosed leopard lizards.  Mot. at 15; *see also* ECF No. 26-1, October 26, 2015 Letter from Sinervo to Corps (discussing Sinervo's research); ECF No. 24-5, December 23, 2015 Letter from Defenders of Wildlife to the Department of the Interior and the Corps (same).  FWS's failure to consider Sinervo's models, Plaintiffs contend, led FWS to underestimate the number of blunt-nosed leopard lizards on the project site and thus the number of blunt-nosed leopard lizards that may be "taken" during the proposed project.  Mot. at 15.  In addition, Plaintiffs claim that the 2016 BiOp fails to address how the distribution of blunt-nosed leopard lizards will be impacted by habitat fragmentation, which results from building the proposed project in a previously uninterrupted piece of habitat.  *Id.*  The Court will first discuss how FWS determined the distribution of blunt-nosed leopard lizards, then address FWS's rejection of Sinervo's models, and lastly discuss habitat fragmentation.

To determine the distribution of blunt-nosed leopard lizards, FWS relied on multiple "abridged" and "full" protocol surveys conducted by PVS in 2009, 2010, and 2013 throughout the project area and conservation lands.[4]  2016 BiOp at 62–63.  Additional surveys were conducted in 2012 by a team of three biologists walking through drainages and adjacent areas in Silver Creek Ranch.  *Id.* at 63.  In the 2016 BiOp, FWS found that "the entire project site supports suitable habitat for the species."  *Id.* at 88.  However, FWS noted that the survey efforts revealed that blunt-nosed leopard lizards were concentrated in creeks on the conservation lands, not in the project site.  *Id.* at 85, 88; *see also id.* at 62 (noting that most blunt-nosed leopard lizards were observed near streams or "washes" in Valley Floor, which is "consistent with known habitat preferences of washes and floodplains").  In addition, FWS noted that the proposed project was designed to avoid locations where blunt-nosed leopard lizards had been observed.  *Id.* at 85.

FWS acknowledged the limitations of the survey efforts and noted that "not all individuals

---

[4] Neither the 2016 BiOp nor the parties' expert declarations explain what this "protocol" is.  The 2016 BiOp explains that "[w]hile full coverage protocol surveys would provide the best information on distribution of the species at the project site, conducting protocol surveys over such a large area is impractical."  2016 BiOp at 62 n.5.  Plaintiffs do not appear to dispute that full and abridged protocol surveys are acceptable methods for determining the distribution of the blunt-nosed leopard lizard.  *See generally* Mot.; Reply.

Case No. 16-CV-01993-LHK
ORDER DENYING MOTION FOR A PRELIMINARY INJUNCTION

may have been observed even at protocol levels due to [the blunt-nosed leopard lizards'] cryptic coloration and their fossorial[5] nature." *Id.* FWS also observed that "[f]ew study authors have calculated population density estimates for the blunt-nosed leopard lizard." *Id.* at 61. Even in light of these limitations, FWS rejected the use of Sinervo's models, as well as the distribution models developed by PVS's consultant. *Id.* at 62 n.5. FWS noted that one unpublished Sinervo model "provides insight into habitat suitability on the project site, but this model has not been peer reviewed." *Id.* This Sinervo model indicates that the "entire project is in a habitat suitability area considered to [be] moderate quality." ECF No. 26-1. Importantly, however, after rejecting Sinervo's models for not being peer reviewed, FWS continued: "Regardless, [FWS] considered the entire project area as suitable habitat for the species, thus use of these models would not affect our determination of suitable habitat or change our conclusions." 2016 BiOp at 62 n.5. Relying on the survey results and the proposed conservation and avoidance measures, FWS concluded that the proposed project would not jeopardize the survival or recovery of the blunt-nosed leopard lizard. *Id.* at 103–04.

Plaintiffs take issue with FWS's decision to reject Sinervo's models. *See* Mot. at 15. However, Plaintiffs fail to acknowledge that the 2016 BiOp states that the use of Sinervo's models would not have changed FWS's analysis: "[FWS] considered the entire project area as suitable habitat for the species, thus use of these models would not affect our determination of suitable habitat or change our conclusions." 2016 BiOp at 62 n.5; *see also id.* at 88 (finding that "the entire project site supports suitable habitat for the species"). It is apparent from this statement that FWS did not "arbitrarily reject[]" Sinervo's models,[6] Mot. at 15, but rather found that the use of

---

[5] "Fossorial" refers to the fact that adult blunt-nosed leopard lizards "may remain in underground burrows for over 21 months during periods were [sic] prey may be low in abundance due to drought conditions." 2016 BiOp at 85. FWS noted that California's prolonged drought conditions "increase the likelihood that blunt-nosed leopard lizards may be in underground burrows and were therefore not detected during survey efforts." *Id.*

[6] In opposition to Plaintiffs' argument that FWS should have considered Sinervo's models, Federal Defendants contend that "[p]rior to issuing the BiOp on March 8, 2016, [FWS] was not provided with this model, nor the assumptions and data used by Dr. Sinervo in the model." Fed. Opp. at 15. However, this was not the explanation given by FWS in the 2016 BiOp for rejecting Sinervo's models. In the 2016 BiOp, FWS concluded that consideration of Sinervo's models

39

1    the models would not impact FWS's conclusions, 2016 BiOp at 62 n.5.  Thus, FWS's rejection of

2    Sinervo's models was not arbitrary and capricious.  *See Cascadia Wildlands v. Thrailkill*, 806 F.3d

3    1234, 1241 (9th Cir. 2015) ("[M]ere disagreement with the result of the biological opinion does

4    not mean that the Service failed to use this scientific data.").

5            As to habitat fragmentation, FWS recognized that the blunt-nosed leopard lizards living in

6    "the Valley Floor Conservation Lands could be at risk of inbreeding depression and local

7    extinction if the area was to become isolated from other populations."  2016 BiOp at 88–89.

8    However, FWS expressly found that habitat fragmentation was unlikely to occur due to the

9    existence of a corridor connecting the conservation lands and the project site.  *Id.* at 89, 91 ("[T]he

10   Valley Floor Conservation Lands provide a corridor which is contiguous with and therefore

11   provides a connection between the other conserved lands to the north and south.  This design

12   component of the conservation lands minimizes the risk of population isolation by allowing for

13   movement, dispersal, and genetic flow.").  Based on this habitat corridor, FWS estimated that

14   "most of the local distribution" of blunt-nosed leopard lizards "will remain intact."  *Id.* at 91.

15           Plaintiffs fail to present better scientific data on which FWS should have relied in

16   concluding that harmful habitat fragmentation would not occur.  Plaintiffs refer—in a

17   parenthetical—to "published research by Bailey and Germano (2015)," but do not explain why

18   this data is better than that relied upon by FWS.  *See* Mot. at 15.  Nor does Plaintiffs' motion

19   explain how Bailey and Germano (2015) undermines FWS's conclusion that the project will not

20   alter most of the local distribution of the blunt-nosed leopard lizard.  For the foregoing reasons,

21   the Court finds that Plaintiffs are not likely to succeed in showing that FWS arbitrarily and

22   capriciously failed to use best available scientific data to determine the distribution of the blunt-

23   nosed leopard lizard or the impact of habitat fragmentation.

24

25   would not change FWS's conclusions.  *See* 2016 BiOp at 62 n.5.  This indicates that, contrary to
     Federal Defendants' briefing, FWS did have Sinervo's models when drafting the 2016 BiOp.  The
26   Court can not rely on "post hoc rationalizations offered by defendants," but must review the 2016
     BiOp according to the administrative record.  *BLM*, 698 F.3d at 1124.  Accordingly, the Court
27   examines the explanation given by FWS in the 2016 BiOp, not the post hoc and contradictory
     explanation given in Federal Defendants' briefing.

28
     Case No. 16-CV-01993-LHK
     ORDER DENYING MOTION FOR A PRELIMINARY INJUNCTION

*United States District Court*
*Northern District of California*

### c. Population of the Giant Kangaroo Rat

Plaintiffs assert that FWS failed to use the best scientific data available to calculate the local population of the giant kangaroo rat, and thus violated the ESA.  According to Plaintiffs, FWS relied on outdated population density estimates when FWS should have examined data sent to the Corps by Bean, a recognized scientific expert on giant kangaroo rats.  Mot. at 16.  Based on the failure to consider Bean's data, Plaintiffs contend that FWS underestimated the harm to the giant kangaroo rat that the project would cause, and overestimated the benefit to the giant kangaroo rat from the conservation lands.  *Id.* at 17.  The Court first examines how FWS calculated the giant kangaroo rat's population, then Plaintiffs' arguments.

In order to determine the pre-project population of giant kangaroo rats, FWS relied on two tools: (1) visual surveys of the proposed project site, and (2) population density estimates from scientific literature.  The visual surveys, conducted in 2013, evaluated 100% of the project site and Valley Floor, as well as 20–30% of Valadeao Ranch and Silver Creek Ranch.  2016 BiOp at 56.  The visual surveys used a grid sampling system whereby 30-meter by 30-meter grids were examined for the presence of giant kangaroo rats.  *Id.*  Upon evaluating 48,446 grid cells, biologists determined that giant kangaroo rats were found in 1.8% of the cells in the project footprint (1.8% "active" cells), 9% of Valley Floor, 1% of Valadeao Ranch, and 23% of Silver Creek Ranch.  *Id.*  FWS rejected the use of data from Bean (2013) and Bean (2014) in favor of FWS's own visual survey, noting that "Bean 2013 and 2014 . . . use regional trapping results and are therefore not directly relevant to the analysis of effects of the project in Panoche Valley."  *Id.* at 56 n.2.  Based on the visual survey data, the project design was altered to avoid the areas with the highest concentration of giant kangaroo rats.  *Id.* at 56–57.

Next, FWS considered scientific literature to estimate the density of the giant kangaroo rat population occupying the "active" cells in the visual surveys.  FWS acknowledged that the literature did not provide a density estimate for giant kangaroo rats in the proposed project area.  *Id.* at 57.  Thus, to approximate density, FWS used data from Williams et al. 1995 analyzing giant kangaroo rat density in the vicinity of Valadeao Ranch, which FWS determined was likely similar

41

United States District Court
Northern District of California

1   to the habitat conditions in the project site.  *Id.*  In addition, FWS noted that "the decline in

2   kangaroo rat abundance and distribution has been well documented" in other areas.  *Id.* at 37.

3   FWS used the maximum measured density from Williams et al. 1995 and a conservative

4   reproduction rate to determine that 435 giant kangaroo rats likely occupy the proposed project site.

5   *Id.* at 57.  PVS proposes to capture and relocate these 435 rats to suitable habitat off-site.  *Id.* at 68.

6          FWS used the same method to estimate the number of giant kangaroo rats on the

7   conservation lands: applying density data from Williams et al. 1995 to the number of "active" cells

8   identified in the visual surveys.  Pursuant to this method, FWS estimated that 5,166 giant

9   kangaroo rats were present on the conservation lands.  *Id.* at 59.  However, unlike the estimate for

10  the giant kangaroo rats on the project site, the conservation lands estimate does not account for

11  any giant kangaroo rat reproduction occurring after the visual surveys.  *Id.*  In addition, the visual

12  surveys of the project site differed from those of some of the conservation lands.  *Id.*  As noted

13  above, the visual surveys covered only 20–30% of Valadeao Ranch and Silver Creek Ranch,

14  compared to 100% of the project site and Valley Floor.  *Id.* at 56.  In light of this difference, FWS

15  found that the population estimate for the conservation lands "should be used cautiously in

16  comparison to the estimate for the project site."  *Id.* at 59.  Based on a "coarse comparison," FWS

17  concluded that "giant kangaroo rats are present and likely in significantly higher numbers on the

18  conservation lands compared to the project site."  *Id.*  FWS concluded accordingly that the project

19  would negatively impact only a small portion of the giant kangaroo rats in the region.  *Id.* at 75.

20         Challenging FWS's population estimate, Plaintiffs raise two arguments.  Plaintiffs first

21  contend that visual survey data can not provide an accurate estimate of the giant kangaroo rat

22  population.  Mot. at 16–17.  Bean explains that one "active" cell in which giant kangaroo rat

23  activity is observed does not necessarily equal one giant kangaroo rat.  ECF No. 26-2, October 23,

24  2015 Letter from Bean to the Corps (providing comments on Corps' draft environmental impact

25  statement) ("[T]here is no relationship between active burrow precinct counts and single year

26  population sizes for giant kangaroo rats.").  FWS in the 2016 BiOp agreed with Bean and

27  Plaintiffs, and rejected a 1:1 relationship between giant kangaroo rats and the "active" cells

United States District Court
Northern District of California

28

42

United States District Court
Northern District of California

identified in the visual surveys.  *See* 2016 BiOp at 57 (finding that "a minimum density estimate of one individual kangaroo rat per active cell is likely to result in a severe underestimate of the actual number of individuals present").  Because FWS did not rely on the one cell to one giant kangaroo rat estimate to which Plaintiffs and Bean object, Plaintiffs' first argument lacks merit.

Second, Plaintiffs assert that Williams et al. 1995 is outdated and overestimates giant kangaroo rat density.  Mot. at 16–17.  Plaintiffs contend that FWS should have looked at density data from Bean (2013) and Bean (2014), collected from the same area as the data in Williams et al. 1995 and through more accurate "mark-recapture" surveys.

The determination of what constitutes the "*best* scientific data available" belongs to FWS's "special expertise. . . . When examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential."  *San Luis I*, 747 F.3d at 602.  As discussed above, here FWS found that "the visual survey data . . . provide better site specific information about species numbers and distribution" and that FWS "used the best site specific survey information in our analysis and surveying results/population densities from Williams et. al. 1995 which included density data from adjacent property parcels."  2016 BiOp at 56 n.2, 57 n.3.  In addition, FWS recognized that the density estimate from Williams et al. 1995 likely overestimated the giant kangaroo rat population and used the population estimate "cautiously."  *Id.* at 59.  Moreover, FWS specifically acknowledged and rejected the Bean studies because "Bean 2013 and 2014 . . . use regional trapping results and are therefore not directly relevant to the analysis of effects of the project in Panoche Valley."  *Id.* at 56 n.2.  Given that the Court must be deferential to FWS's selection of expert methodology, Plaintiffs fail to show that they are likely to succeed on Plaintiffs' claim that FWS arbitrarily and capriciously ignored Bean's data when estimating the giant kangaroo rat population.  *See San Luis II*, 776 F.3d at 995 ("An agency complies with the best available science standard so long as it does not ignore available studies, even if it disagrees with or discredits them.").

### d.  Impact of Drought on the Giant Kangaroo Rat

Plaintiffs next contend that FWS violated the ESA by failing to consider the best available

43

1    scientific data on the impact of drought on giant kangaroo rat survival and recovery.  Mot. at 17.

2    According to Plaintiffs, FWS did not consider the impact of drought even though Bean's data

3    "shows that current (drought) conditions likely make the immediate impact of losing the

4    individuals from the Project site far greater than would be anticipated based on long-term

5    averages."  *Id.*  In addition, Plaintiffs contend that FWS "claims it considered the effect of drought

6    on the species, but it did not adequately consider the impacts of the project site as a fulcrum for

7    migration during wet and dry years, nor did it attempt to rebut Dr. Bean's assertion that loss of this

8    central space would reduce distribution of the species and thus the likelihood of its survival and

9    recovery."  Reply at 7 (internal citation omitted).

10           Plaintiffs do not establish a likelihood of success on Plaintiffs' claim that FWS arbitrarily

11   and capriciously failed to consider the impact of drought.  In fact, FWS in the 2016 BiOp

12   repeatedly addressed the impact of drought and annual rainfall on the giant kangaroo rat

13   population.  For example, FWS noted that monitoring studies conducted by the Bureau of Land

14   Management in other areas "showed significant declines in giant kangaroo rat numbers in

15   response to both drought and above average rainfall conditions."  2016 BiOp at 37–38; *see also id.*

16   at 36 ("Changes in weather patterns were linked to expansion and declines in giant kangaroo rat

17   populations in the recovery plan."); *id.* at 37 ("Current populations of the giant kangaroo rat

18   fluctuate widely in response to changing weather patterns."); *id.* at 38 (noting that the giant

19   kangaroo rat population "increased dramatically" after the end of a 5-year drought); *id.* at 39

20   (noting that random catastrophic events like drought pose the greatest risk to giant kangaroo rats'

21   long-term survival); *id.* at 57 (noting that there have been "several years of drought conditions

22   which could reduce reproductive rates").

23           Although Plaintiffs acknowledge that FWS claims that it considered the effect of drought

24   on the species, Plaintiffs still contend that FWS did not adequately consider the impact of the

25   project site on the migration and the distribution of the giant kangaroo rat.  Reply at 7.  However,

26   FWS in the 2016 BiOp specifically acknowledged that the "local distribution of the species would

27   be altered due to the removal of occupied habitat."  2016 BiOp at 76.  However, FWS concluded

28

44

Case No. 16-CV-01993-LHK
ORDER DENYING MOTION FOR A PRELIMINARY INJUNCTION

1  that "the majority of the Panoche Valley population . . . is expected to be conserved" and "the

2  proposed action would not reduce the rangewide distribution of the giant kangaroo rat." *Id.* at 70

3  n.7, 76.  Similarly, FWS noted that the inclusion of a corridor connecting the conservation lands

4  and the project site "is expected to allow for movement sufficient to allow genetic exchange

5  within the local metapopulation and between landscape level metapopulations." *Id.* at 70 & n.9

6  ("We expect that the individual giant kangaroo rats not affected by project activities will persist in

7  the Valley Floor Conservation Lands and will continue to provide the 'stepping stone' colony for

8  the species.").  Plaintiffs identify no better scientific data that FWS should have considered in

9  analyzing the impact of drought or the giant kangaroo rat distribution.  Accordingly, Plaintiffs are

10  not likely to succeed in showing that FWS arbitrarily and capriciously failed to consider the

11  impact of the drought or the giant kangaroo rat distribution.  *See Kern Cty. Farm Bureau v. Allen*,

12  450 F.3d 1072, 1080 (9th Cir. 2006) (noting that the best available science requirement "merely

13  prohibits [an agency] from disregarding available scientific evidence that is in some way better

14  than the evidence [the agency] relies on").

### e.  Impact of Giant Kangaroo Rat Relocation on the San Joaquin Kit Fox

16  One of the conservation measures proposed as part of the project design is the relocation of

17  the 435 giant kangaroo rats estimated to be on the project site to alternate suitable habitat free

18  from the impacts of the project.  2016 BiOp at 68–69.  FWS expects that this relocation will be at

19  least partly successful and will reduce the overall impact of the project on the giant kangaroo rat

20  population.  *Id.* at 74.  For the purposes of determining whether the project is likely to jeopardize

21  the survival and recovery of the giant kangaroo rat as a species, however, FWS conservatively

22  assumes the worst case scenario: that all 435 giant kangaroo rats will perish in the relocation

23  efforts.  *Id.*  Plaintiffs contend that FWS violated the ESA by failing to properly consider the

24  impact of the assumed death of 435 giant kangaroo rats on the San Joaquin kit fox, "which feeds

25  on the rats and is ecologically linked to the species."  Mot. at 18.

26  Plaintiffs are not likely to succeed on Plaintiffs' claim that FWS failed to consider the

27  impact of the giant kangaroo rat relocation on the San Joaquin kit fox.  In the 2016 BiOp, FWS

specifically addressed this issue: "The relocation of giant kangaroo rats from the project footprint may reduce the potential for San Joaquin kit foxes to persist in and around the solar arrays" on the project site.  2016 BiOp at 78.  The 2016 BiOp also notes that "kit foxes may be less likely to use the [project site] if giant kangaroo rats are not present as a prey source." *Id.* at 66; *see also id.* at 108 (finding that the project "would result in the loss of foraging, breeding, sheltering, and dispersal habitat" for the kit fox).  Plaintiffs do not point to any better scientific data that FWS should have considered regarding the impact of the giant kangaroo rats' relocation on the San Joaquin Kit Fox.  *See San Luis I*, 747 F.3d at 602 ("Absent superior data[,] occasional imperfections do not violate the ESA best available standard." (internal quotation marks omitted)).  In light of the foregoing, the Court finds that Plaintiffs do not establish a likelihood of success on the merits of Plaintiffs' claim that FWS failed to consider the impact of the giant kangaroo rat relocation on the San Joaquin kit fox.

### f.   Loss of Habitat for the Giant Kangaroo Rat and San Joaquin Kit Fox

Finally, Plaintiffs claim that FWS inadequately considered the impact of habitat loss caused by the project on the survival and recovery of the giant kangaroo rat and San Joaquin kit fox.  Although Plaintiffs frame this argument as part of Plaintiffs' challenge to FWS's use of best available scientific data, Plaintiffs do not highlight any relevant scientific data that FWS failed to consider.  *See Kern Cty. Farm Bureau*, 450 F.3d at 1080 (noting that the best available science requirement "merely prohibits [an agency] from disregarding available scientific evidence that is in some way better than the evidence [the agency] relies on").  Rather, it appears that Plaintiffs disagree with how FWS weighed the relevant scientific data.

Plaintiffs raise legitimate concerns.  All parties agree that the proposed project converts 1,688 acres of suitable giant kangaroo and San Joaquin kit fox habitat into unsuitable habitat.  In addition, all parties agree that the giant kangaroo rat and San Joaquin kit fox are in danger of extinction and have very little suitable habitat remaining.  While the conservation lands Valley Floor, Valadeao Ranch, and Silver Creek Ranch provide permanent protection to suitable habitat, Plaintiffs point out that the conservation lands were already being managed by private owners in a

Case No. 16-CV-01993-LHK
ORDER DENYING MOTION FOR A PRELIMINARY INJUNCTION

United States District Court
Northern District of California

1   manner consistent with suitable giant kangaroo rat and San Joaquin kit fox habitat.  2016 BiOp at

2   97 ("The conservation lands are currently managed for free range cattle grazing.  This land use has

3   provided near optimal habitat conditions for giant kangaroo rats, San Joaquin kit foxes, blunt-

4   nosed leopard lizards. . . .").  Accordingly, the proposed project causes habitat loss without an

5   expansion of suitable habitat elsewhere.  Mot. at 17–18.  In Plaintiffs' view, this fact should have

6   led FWS to conclude that the project jeopardizes the survival and recovery of the giant kangaroo

7   rat and San Joaquin kit fox.  *See id.* (arguing that FWS "never explains how the potential loss of

8   all 435 giant kangaroo rats and 1,688 acres of prime habitat on the site can be offset by merely

9   maintaining current conditions on habitat elsewhere in the region"); *id.* ("[FWS] also does not

10  adequately explain how loss of 1,688 acres of 'optimal' kit fox habitat is effectively mitigated by

11  preserving existing habitat elsewhere.").

12          Despite Plaintiffs' arguments, "[t]he court is not empowered to substitute its judgment for

13  that of the agency."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971),

14  *abrogated on other grounds as recognized by Califano v. Sanders*, 430 U.S. 99, 105 (1977).

15  Rather, the Court must determine whether the FWS's decision was based on "consideration of the

16  relevant factors and whether there has been a clear error of judgment."  *San Luis I*, 747 F.3d at

17  601.  The Court addresses these two issues.

18          It is apparent that FWS considered the "relevant factors" identified by Plaintiffs.  In the

19  2016 BiOp, FWS acknowledged the loss of habitat, including that the "removal of occupied and

20  suitable habitat would reduce the overall area of potential population . . . expansion" of giant

21  kangaroo rats in the region.  2016 BiOp at 100; *id.* at 102 (explaining that the proposed project

22  "would permanently remove some occupied, optimal habitat" of San Joaquin kit foxes); *see also*

23  *id.* at 82 ("Despite the conservation of existing habitat, the project would still result in a net loss of

24  suitable and occupied habitat for the San Joaquin kit fox and a minor reduction of area available

25  for recovery of the species.").  FWS also acknowledged that the habitat that will be lost because of

26  the project has been identified as important to the recovery of both species.  *See id.* at 97 (noting

27  the "Ciervo-Panoche Natural Area" is "Priority Level 1," which means that "action must be taken .

28

Case No. 16-CV-01993-LHK
ORDER DENYING MOTION FOR A PRELIMINARY INJUNCTION

1    . . to prevent extinction or to prevent a species from declining irreversibly in the foreseeable

2    future").  FWS further acknowledged that the proposed project "does not further this goal" of

3    protecting high value habitat in the Panoche Valley area.  *Id.*  Plaintiffs identify no other "relevant

4    factors" that FWS should have considered.  Thus, FWS considered the relevant factors.

5         As to whether FWS committed a clear error of judgment, "if the evidence is susceptible of

6    more than one rational interpretation, the court must uphold the agency's findings."  *San Luis I*,

7    747 F.3d at 601 (brackets omitted).  Unlike Plaintiffs, FWS found that the permanent protection of

8    the conservation lands mitigates the negative impact of the habitat loss caused by the project.  *See*

9    2016 BiOp at 73, 97 (noting that the conservation lands will "provide protection from

10   incompatible future land uses and maintain an optimal grazing regime for the species").  To reach

11   this conclusion, FWS found that "specific management of the lands for these species will further

12   recovery efforts" and the purchase and management of the conservation lands is "expected to

13   maintain or minimally increase the numbers of giant kangaroo rats, [and] San Joaquin kit foxes."

14   *Id.* at 97; *see also id.* at 83 ("While the proposed protection and management of the conservation

15   lands is not expected to result in increased numbers of San Joaquin kit foxes . . . the proposed

16   project will contribute to recovery by providing permanent protection of these lands consistent

17   with the recovery plan.").

18        In addition, FWS placed significant value on conservation measures for which Plaintiffs do

19   not account, including: (1) the project site was designed to avoid areas with high densities of giant

20   kangaroo rats; (2) the conservation lands provide a corridor of habitat through the middle of the

21   project, which connects populations living on the conservation lands to the north and south of the

22   project site; and (3) PVS has proposed a variety of measures to minimize the impacts of the

23   project, such as educating project personnel on the identification of endangered species,

24   employing FWS-approved biologists to monitor construction, and avoiding active San Joaquin kit

25   fox dens.  *Id.* at 22–23, 27–28, 99–102.  Weighing the permanent protection of high value habitat

26   in the conservation lands and these other conservation measures, FWS concluded that the

27   proposed project was not likely to jeopardize the survival and recovery of the giant kangaroo rat

28

Case No. 16-CV-01993-LHK
ORDER DENYING MOTION FOR A PRELIMINARY INJUNCTION

United States District Court
Northern District of California

1    and San Joaquin kit fox.  While Plaintiffs disagree, the conservation lands and other conservation

2    measures appear to constitute "relevant evidence [such that] a reasonable mind might accept as

3    adequate to support" FWS's conclusion.  *San Luis I*, 747 F.3d at 601; *see also CBD*, 807 F.3d at

4    1050 (upholding FWS's conclusion when "rationally based on available evidence").

5    Consequently, Plaintiffs do not establish that they are likely to succeed in showing that FWS

6    arbitrarily and capriciously weighed the relevant evidence according to FWS's judgment, even if

7    FWS could have rationally weighed the evidence in a different way.

8         In sum, having reviewed the six arguments raised by Plaintiffs, the Court concludes that

9    Plaintiffs do not demonstrate a likelihood of success on the merits of Plaintiffs' claim that FWS

10   violated the ESA by failing to consider the best available scientific data when drafting the 2016

11   BiOp.  Accordingly, the Court concludes that Plaintiffs do not establish a likelihood of success on

12   the merits of Plaintiffs' derivative claim that the Corps violated the CWA by relying on the 2016

13   BiOp.

14        **B.  Remaining *Winter* Factors**

15        Plaintiffs do not establish a likelihood of success on the merits of Plaintiffs' claims

16   asserted in the instant motion, as discussed above.  Accordingly, the Court need not consider

17   irreparable harm, the balance of equities, or the public interest.  *Cascadia Wildlands*, 806 F.3d at

18   1244 ("Because the district court acted within its discretion in reaching that conclusion [of no

19   likelihood of success on the merits], we need not consider the remaining preliminary injunction

20   factors."); *see also Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048, 1058 (9th Cir. 2013)

21   (affirming district court's denial of a preliminary injunction based only on review of the lack of a

22   likelihood of success on the merits).

23   **V.    CONCLUSION**

24        For the foregoing reasons, the Court DENIES Plaintiffs' motion for a preliminary

25   injunction.

26

27

28
                                                    49

**IT IS SO ORDERED.**

Dated: August 17, 2016

_____
LUCY H. KOH
United States District Judge

Case No. 16-CV-01993-LHK
ORDER DENYING MOTION FOR A PRELIMINARY INJUNCTION